HUMANITARIAN LAW PROJECT,
et al. Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
TREASURY, et al. Defendants.

No. CV 05–8047 ABC (RMCX).

United States District Court,
C.D. California.

Nov. 21, 2006.

David Cole, Center For Constitutional Rights, Washington, DC, for Humanitarian Law Project, Tamil Welfare and Human Rights Committee, World Tamil Coordinating Committee, Ilankai Thamil Sangam, Nagalingam Jeyalingam, Ralph D Fertig, Plaintiffs.

Paul L Hoffman, Schonbrun DeSimone Seplow Harris and Hoffman, Venice, for Humanitarian Law Project, Tamil Welfare and Human Rights Committee, World Tamil Coordinating Committee, Ilankai Thamil Sangam, Nagalingam Jeyalingam, Ralph D Fertig, Plaintiffs.

Shayana Devendra Kadidal, Center for Constitutional Rights, New York, NY, for Humanitarian Law Project, Tamil Welfare and Human Rights Committee, World Tamil Coordinating Committee, Ilankai Thamil Sangam, Nagalingam Jeyalingam, Ralph D Fertig, Plaintiffs.

Visuvanathan Rudrakumaran, Visuvanathan Rudrakumaran Law Offices, New York, NY, for Humanitarian Law Project, Tamil Welfare and Human Rights Committee, World Tamil Coordinating Committee, Ilankai Thamil Sangam, Nagalingam Jeyalingam, Ralph D Fertig, Plaintiffs.

Carol A Sobel, Carol A Sobel Law Offices, Santa Monica, CA, for Humanitarian

Law Project, Tamil Welfare and Human Rights Committee, World Tamil Coordinating Committee, Ilankai Thamil Sangam, Nagalingam Jeyalingam, Ralph D Fertig, Plaintiffs.

John Russell Tyler, U.S. Department of Justice, Civil Division, Washington, DC, for United States Department of Justice, United States Department of State, United States Department of the Treasury, Alberto Gonzales, Condoleeza Rice, John Snow, Defendants.

## ORDER RE: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS AND CROSS–MOTION FOR SUMMARY JUDGMENT

COLLINS, District Judge.

Pending before the Court are Plaintiffs' Motion for Summary Judgment and Defendants' Motion to Dismiss and Cross–Motion for Summary Judgment. The parties' Motions came on for hearing on July 26, 2006. Having considered the parties' submissions, the case file, and counsels' arguments, the Court GRANTS in part and DENIES in part Plaintiffs' Motion, and GRANTS in part and DENIES in part Defendants' Motion to Dismiss and Cross–Motion for Summary Judgment.

## BACKGROUND

This case is the latest in a series of challenges that Plaintiffs have raised to measures taken by the Federal Government in the wake of the September 11, 2001 attacks on this Country. Plaintiffs are five organizations and two United States citizens seeking to provide support to the lawful, nonviolent activities of the Partiya Karkeran Kurdistan (Kurdistan Workers' Party) ("PKK") and the Liberation Tigers of Tamil Eelam ("LTTE"). The PKK and the LTTE have been designated as foreign terrorist organizations.

The PKK is a political organization representing the interests of the Kurds in Turkey, with the goal of achieving self-determination for the Kurds in Southeastern Turkey. Plaintiffs allege that the Turkish government has subjected the Kurds to human rights abuses and discrimination for decades. The PKK's efforts on behalf of the Kurds include political organizing and advocacy, providing social services and humanitarian aid to Kurdish refugees, and engaging in military combat with Turkish armed forces.

The LTTE represents the interests of Tamils in Sri Lanka, with the goal of achieving self-determination for the Tamil residents of Tamil Eelam in the Northern and Eastern provinces of Sri Lanka. Plaintiffs allege that the Tamils constitute an ethnic group that has for decades been subjected to human rights abuses and discriminatory treatment by the Sinhalese, who have governed Sri Lanka since the nation gained its independence in 1948. The LTTE's activities include political organizing and advocacy, providing social services and humanitarian aid, defending the Tamil people from human rights abuses, and using military force against the government of Sri Lanka.

Plaintiffs seek to aid the PKK and the LTTE in the following ways: (1) they seek to provide training in human rights advocacy and peacemaking negotiations, as well as to provide legal services in aid of setting up institutions for providing humanitarian aid and in negotiating a peace agreement; (2) they seek to provide humanitarian aid directly to the PKK and LTTE; (3) they seek to provide engineering services and technological support to help rebuild the infrastructure in tsunami-afflicted areas; and (4) they seek to provide psychiatric counseling for survivors of the tsunami.

In the past, Plaintiffs have directed their challenges to the Antiterrorism and Effec-

tive Death Penalty Act (the "AEDPA"), as enacted by Congress in 1996 and amended by the USA PATRIOT Act and the IRT-PA.[1] The AEDPA, as amended by the IRTPA, provides as follows:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.

18 U.S.C. § 2339B(a). The AEDPA, as amended by the USA PATRIOT Act and the IRTPA, provides the following definition of "material support or resources":

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

In this case, however, Plaintiffs for the first time challenge Executive Order 13224, signed by President George W. Bush on September 23, 2001 pursuant to the emergency powers vested in him by the International Emergency Economic Powers Act ("IEEPA"). Below, the Court summarizes the statutory framework of the IEEPA and the relevant provisions of Executive Order 13224 and its Regulations.

## A. IEEPA

In 1977, Congress enacted the IEEPA to amend the Trading With the Enemy Act ("TWEA"). The TWEA, which was enacted in 1917 and amended in 1933, granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared emergencies. 50 U.S.C. app. § 5(b).

With the 1977 IEEPA, Congress limited the TWEA's applicability to times of war, but provided the President similar emergency economic power in peacetime national emergencies. The IEEPA authorizes the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Under this authority, the President may take the following actions:

> [I]nvestigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States. . . .

50 U.S.C. § 1702(a)(1)(B). Although the President's authority under the IEEPA is broad, he can only exercise this authority to deal with a declared emergency that constitutes an "unusual and extraordinary

---

**1.** The USA PATRIOT Act is an acronym for the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act. The USA PATRIOT Act, which was enacted in 2001, amended the AEDPA. The IRTPA is an acronym for the Intelligence Reform and Terrorism Prevention Act, which amended the AEDPA in 2004.

threat." 35 U.S.C. § 1701(b). The IEE-PA also authorizes the President to issue regulations in order to effectively exercise the authority granted him by § 1701 and § 1702 of the IEEPA.

## B. Executive Order 13224

Days after the September 11, 2001 attacks, President Bush invoked his authority under the IEEPA and issued Executive Order 13224 (the "EO"). In the EO, President Bush declared that the "grave acts of terrorism" and the "continuing and immediate threat of future attacks" on the United States constituted a national emergency.

President Bush further blocked all property and interests in property of twenty-seven groups and individuals, each of which President Bush designated as specially designated global terrorists ("SDGT"). These twenty-seven groups and individuals are identified in the Annex to the EO. Thereafter, he authorized the secretary of the treasury, in consultation with the secretary of state and the attorney general, to designate additional SDGTs provided that the given individual or group to be designated satisfied the criteria set forth in the EO. *See* EO § 1(b)-(d)(ii). In summary, President Bush authorized the secretary of the treasury to designate as an SDGT anyone acting "for or on behalf of" or "owned or controlled by" a designated terrorist group. EO § 1(b)-(c). The secretary of the treasury was also authorized to designate anyone who assists, sponsors, or provides "... services to" or is "otherwise associated with" a designated terrorist group. EO § 1(d)(i)-(ii).

Furthermore, President Bush delegated to the secretary of the treasury his authority to issue any regulations that "may be necessary to carry out the purposes of [the EO]." EO § 7. Accordingly, the Office of Foreign Assets Control ("OFAC") issued a series of regulations accompanying the EO (the "Regulations"). Among these Regulations is a provision permitting individuals and groups to obtain a license to engage in otherwise prohibited transactions with SDGTs. Furthermore, the Regulations allow a designated individual or group to seek administrative review of any designation made pursuant to the EO.

## C. The Court's July 25, 2005 Order in Case Nos. CV 98–1971 ABC and CV 03–6107 ABC

The Court has recited the procedural history of Plaintiffs' various challenges to the AEDPA on several occasions. Accordingly, the Court need not do so again here.[2] Instead, the Court will only briefly summarize the relevant portions of the Court's Order regarding Plaintiffs' last challenge to the AEDPA, as that Order has implications for this case.

In their last challenge to the AEDPA, Plaintiffs successfully challenged the constitutionality of the AEDPA's use of the word "service" on vagueness grounds. Specifically, the Court agreed with Plaintiffs that the AEDPA's use of the undefined word "service" was vague as applied to Plaintiffs' proposed activity of "teaching international law for peacemaking resolutions or how to petition the United Nations to seek redress for human rights violations." *Humanitarian Law Project*, 380 F.Supp.2d at 1150. Accordingly, the Court enjoined the Government from enforcing the AEDPA's prohibition on providing "service" against Plaintiffs for engaging in this activity. The Court, however, rejected

---

**2.** The Court incorporates by reference the "Procedural Background" section of its July 25, 2005 Order in Case Nos. CV 98–1971 ABC (RCx) and CV 03–6107 ABC (RCx). *Humanitarian Law Project v. Gonzales*, 380 F.Supp.2d 1134, 1138–39 (C.D.Cal.2005).

**1056**

Plaintiffs' overbreadth challenge to the term "service." Likewise, the Court rejected Plaintiffs' challenge to the AEDPA's licensing provision, which allowed authorities to grant licenses to engage in otherwise prohibited conduct under the AEDPA.

### D. The Instant Case

Shortly after the Court issued its prior Order, Plaintiffs filed a Complaint in this matter. Thereafter, on April 6, 2006, Plaintiffs filed a Motion for Summary Judgment. On May 1, 2006, Defendants filed a combined Motion to Dismiss and Cross–Motion for Summary Judgment and Opposition to Plaintiffs' Motion. On May 23, 2006, Plaintiffs filed a combined Reply in Support of their Motion and Opposition to Defendants' Cross–Motion. On June 8, 2006, Defendants filed a Reply in Support of their Cross–Motion. On July 26, 2006, the Court heard oral argument on the matter. At the hearing, the Court requested supplemental briefing regarding whether Plaintiffs have standing to bring one of their challenges. On August 22, 2006, Plaintiffs filed their Supplemental Memorandum. On September 18, 2006, Defendants filed their Supplemental Memorandum. On September 26, 2006, Plaintiffs filed their Supplemental Reply. The Court took the matter under submission.

### LEGAL STANDARD

The party moving for summary judgment has the initial burden of establishing that there is "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978); *Fremont Indem. Co. v. Cal. Nat'l Physician's Ins. Co.*, 954 F.Supp. 1399, 1402 (C.D.Cal.1997).

Where the moving party bears the burden of persuasion at trial, the moving party must show that no reasonable trier of fact could find other than for the moving party. William W. Schwarzer, et al., California Practice Guide: Federal Civil Procedure Before Trial § 14:124–127 (2001). The moving party's burden extends to each element of the claim or claims on which it seeks summary judgment. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir.2003) ("As the party with the burden of persuasion at trial, the [plaintiff] must establish 'beyond controversy every essential element of its' Contract Clause claim."); Schwarzer, California Practice Guide: Federal Civil Procedure Before Trial § 14:124–127; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986) ("If the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant asserting an affirmative defense, he must establish beyond preadventure *all* of the essential elements of the claim or defense to warrant judgment in his favor.") (emphasis in original).

If, on the other hand, the non-moving party has the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citations omitted).

Once the moving party satisfies its initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings.... [T]he adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Pro.

56(e) (emphasis added); *S. Cal. Gas Co.,* 336 F.3d at 888 ("[The non-moving party] can defeat summary judgment by demonstrating the evidence, taken as a whole, could lead a rational trier of fact to find in its favor.") (citations omitted). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the court must view the evidence presented "through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. 2505.

## DISCUSSION

Plaintiffs challenge five aspects of the EO and its accompanying Regulations. First, they contend that the EO's ban on "services" is unconstitutionally vague because it fails to adequately notify the public, and Plaintiffs specifically, of the conduct to which the ban applies. Furthermore, they argue that the ban on "services" is overbroad because it encompasses a substantial amount of protected speech. Second, they assert that the EO Regulations are vague because they contain no definition of the term "specially designated terrorist group," thereby giving the President unfettered discretion to designate which individuals and groups fit within that term. Third, Plaintiffs contends that the President's designation authority, as exercised in the EO itself and as distinct from the designation authority delegated to the secretary of treasury, is unconstitutionally vague. Fourth, Plaintiffs contend that the EO's ban on being "otherwise associated with" a terrorist group is vague and overbroad, as it punishes individuals and groups for exercising their First Amendment right to freedom of association. Fifth, Plaintiffs maintain that the Regulations' licensing provision violates the First and Fifth Amendments because it contains no sub-

stantive or procedural safeguards for determining which individuals or groups qualify for a license. As such, according to Plaintiffs, the licensing provision gives authorities unfettered discretion to grant or deny a license.

Alternatively, Plaintiffs urge the Court to avoid these "constitutional difficulties" by construing the IEEPA and the EO in a way that Plaintiffs believe would comport with the Constitution. Specifically, Plaintiffs urge the Court to either restrict the reach of the IEEPA or to read into the EO a specific intent requirement that would preclude enforcement unless the given group or individual specifically intended to aid the illegal activities of an SDGT. As discussed below, the Court declines Plaintiffs' invitation to adopt their proposed construction of the IEEPA or the EO.

In their motions, Defendants seek dismissal of Plaintiffs' challenges to the President's designation authority, to the "otherwise associated with" provision, and to the licensing provision on the ground that Plaintiffs lack standing to bring these challenges. Defendants moved for summary judgment with regard to Plaintiffs' remaining challenges.

The Court addresses each of Plaintiffs' challenges in turn below.

### A. Plaintiffs' Challenge to the EO's Ban on "Services"

#### 1. Vagueness

■ A challenge to a statute based on vagueness grounds requires the court to consider whether the statute is "sufficiently clear so as not to cause persons 'of common intelligence ... necessarily [to] guess at its meaning and [to] differ as to its application.' " *United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir.1996) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). Vague statutes are void for

three reasons: "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).

■ "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). "The requirement of clarity is enhanced when criminal sanctions are at issue or when the statute abuts upon sensitive areas of basic First Amendment freedoms." *Info. Providers' Coal. for Def. of the First Amendment v. FCC*, 928 F.2d 866, 874 (9th Cir.1991) (internal quotation marks and citations omitted). Thus, under the Due Process Clause, a criminal statute is void for vagueness if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). A criminal statute must therefore "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited . . . ." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

A plaintiff's challenge to a statute on vagueness grounds can take two forms.

First, the plaintiff can challenge the statute as vague as applied to the specific conduct in which the plaintiff seeks to engage. Alternatively, the plaintiff can challenge the statute as vague on its face, which encompasses actions beyond those of the individual plaintiff. In this case, Plaintiffs contend that the EO's ban on "services" is vague both as applied and on its face.

### a. Vague as Applied

Most commonly, a plaintiff will challenge a restriction on speech activity "as-applied" to the plaintiff's proposed conduct, although, as here, such challenges are often coupled with a facial vagueness challenge. *Foti*, 146 F.3d at 629 (citing *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1352 (9th Cir.1984)). "An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Id.* (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 & n. 2, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)).

In contrast to a facial challenge, an as-applied challenge implicates the statute's enforcement only as to the plaintiff challenging the statute. *Id.* It does not, however, implicate the enforcement of the law against third parties. *Id.* Thus, unlike the "strong medicine" of overbreadth or facial vagueness invalidation, a successful as-applied challenge does not render the law itself invalid. *Foti*, 146 F.3d at 635. Instead, it serves only to prohibit the law's application to the plaintiff's particular conduct to which the law's application is allegedly vague. *Id.*

■ Here, the EO's ban on "services" is not vague as applied to Plaintiffs' proposed conduct.[3] On the contrary, it unquestion-

---

**3.** The Regulations define "provision of services" as follows:

(a) Except as provided in § 594.207, the prohibitions on transactions or dealings in-

ably applies to each of the activities in which Plaintiffs seek to engage. First, the Regulations' prohibition on providing "educational" and "legal" "services" unequivocally prohibits Plaintiffs from providing training in human rights advocacy and peacemaking negotiations, as well as providing legal services in setting up institutions to provide humanitarian aid and in negotiating a peace agreement. Second, while not covered by the Regulations' definition of "services," the EO itself explicitly bars Plaintiffs from providing humanitarian aid to the PKK and LTTE. *See* EO § 4.[4] Third, to the extent that the Regulations' definition of "services" leaves any ambiguity about whether Plaintiffs may provide engineering services and technological support to help rebuild the infrastructure in tsunami-afflicted areas, the EO's ban on providing "technological support" eliminates any such ambiguity.[5] EO § 1(d)(i); *see Gospel Missions of Am. v.*

*City of Los Angeles,* 419 F.3d 1042, 1048 (9th Cir.2005) (finding no ambiguity as to whether statutory provision governing solicitations of charitable contributions applied to panhandlers or church bake sales because other provisions within statute clarified ambiguity).

In contrast, the EO's ban on "services" does not apply to Plaintiffs' efforts to independently support the PKK or LTTE in the political process. Nothing in the EO Regulations'. definition of "services" prohibits independent political activity; instead, the Regulations prohibit Plaintiffs from providing "services" to an SDGT. This prohibition would not, for example, prohibit Plaintiffs from vocally supporting the activities of the PKK or the LTTE. Indeed, the Government readily concedes this fact:

> Plaintiffs otherwise argue that, "because the ban extends not only to services provided 'to' an SDGT, but also to ser-

---

volving blocked property contained in §§ 594.201 and 594.204 apply to services performed in the United States or by U.S. persons, wherever located, including by an overseas branch of an entity located in the United States:
> (1) On behalf of or for the benefit of a person whose property or interests in property are blocked pursuant to § 594.201(a); or
> (2) With respect to property interests subject to §§ 594.201 and 594.204.
> (b) Example: U.S. persons may not, except as authorized by or pursuant to this part, provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, educational, or other services to a person whose property or interests in property are blocked pursuant to § 594.201(a).
> 31 C.F.R. § 594.406.

4. As a general rule, the IEEPA does not authorize the Executive to regulate or prohibit humanitarian aid, even if the Executive declares an emergency under § 1702(a). 50 U.S.C. § 1702(b)(2). But this general rule is inapplicable where, among other situations, the Executive determines that providing humanitarian aid "would seriously impair his

ability to deal with any national emergency declared under section 1701 of this title … or would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances." *Id.* In signing the EO, President Bush invoked both of these exceptions, stating: "I hereby determine that the making of donations of the type specified in section 203(b)(2) of IEEPA (50 U.S.C. § 1702(b)(2)) by United States persons to persons determined to be subject to this order would seriously impair my ability to deal with the national emergency declared in this order, and would endanger Armed Forces of the United States that are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances, and hereby prohibit such donations as provided by section 1 of this order." EO § 4.

5. Furthermore, aiding the PKK and LTTE in their effort to rebuild infrastructure in tsunami-afflicted areas would likely fall within the ban on providing humanitarian aid. *See* EO § 4.

vices that are determined to be 'for the benefit of' an SDGT, the ban appears to apply even to wholly independent advocacy or services ...." But E.O. 13224 is quite obviously not intended to apply to independent advocacy in support of designated groups as plaintiffs suggest.

Defs.' Mot. at 16–17 (quoting Pls.' Mem. at 14).[6]

Moreover, contrary to Plaintiffs' argument, the fact that the Court previously found the AEDPA's use of the word "service" vague as applied does not dictate that the Court must likewise find the EO's use of the word "services" vague in this case. On the contrary, Plaintiffs' argument overlooks the differences between the word "service" in the AEDPA and the word "services" in the EO. The AEDPA's ban on "service" was not as clear as that in the EO with respect to Plaintiffs' proposed activities. Indeed, to the extent that the AEDPA offered illustrations of what would constitute "service," those illustrations included "training" and "expert advice or assistance," two terms that the Court had already concluded were impermissibly vague. Given the vagueness of these words, the resulting illustrations of "service" provided little, if any, guidance for Plaintiffs to determine whether the AEDPA prohibited them from "teaching international law for peacemaking resolutions or how to petition the United Nations to seek redress for human rights violations."

*Humanitarian Law Project*, 380 F.Supp.2d at 1150.

Additionally, even if the AEDPA's definition of "service" contained only clear terms, its application was questionable as to Plaintiffs' proposed activities. The AEDPA contained no reference to "legal" or "educational" services in its list of activities falling within the statute's prohibition on "service." In contrast, the EO's definition of "services" includes these terms and, as such, leaves no doubt as to whether Plaintiffs' proposed activities would be prohibited. Indeed, such activities would most definitely constitute "legal" or "educational" "services," which the EO's Regulations unequivocally prohibit. This difference renders Plaintiffs' reliance on the Court's past Order untenable.

Although Plaintiffs could, no doubt, conceive of some activity to which application of the EO's ban on "services" might be less clear, Plaintiffs have not demonstrated that they intend to engage in any such hypothetical conduct. Instead, they have identified only activity that falls squarely within the conduct that the EO prohibits. Accordingly, their vagueness challenge to the EO as applied to their proposed activity fails.

### b. Vague on Its Face

Facial invalidation of a statute on vagueness grounds " 'is, manifestly, strong medicine' " that should not be used except as a

---

**6.** Plaintiffs note that the EO's ban on services prohibits the provision of services "[o]n behalf of or for the benefit of" an SDGT. 31 C.F.R. § 594.406. Plaintiffs argue that this broad ban on "services" dictates that the Court find this term unconstitutional. In so arguing, Plaintiffs note that the Court previously found unconstitutional the AEDPA's more narrow ban on "service," which the Government conceded prohibited only acts done "for the benefit of another," but not those done "on behalf of another." *See Humanitarian Law Project*, 380 F.Supp.2d at 1152. Plaintiffs, however, are mistaken, as the Court did not rest its finding that the AEDPA's ban on "service" was vague as applied on this distinction. Instead, the Court merely noted that the Government's distinction between acts done "for the benefit of another" and those done "on behalf of another" was a distinction without a difference. *Id.* ("[T]here is no readily apparent distinction between taking action 'on behalf of another' and 'for the benefit of another.' "). Here, the Government does not parse the terms "for the benefit of" and "on behalf of." Accordingly, Plaintiffs' reliance on the Court's previous comments on this point is unavailing.

" 'last resort.' " *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1155 (9th Cir.2001) (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998)). Indeed, "a successful challenge to the facial unconstitutionality of a law invalidates the law itself," as opposed to invalidating the law's applicability to only a specific plaintiff's conduct. Consequently, challenges to a statute as vague on its face are permitted only in limited circumstances. *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346 (9th Cir.1984) (citing *Flipside*, 455 U.S. at 495, 102 S.Ct. 1186; *United States v. Mussry*, 726 F.2d 1448, 1454 (9th Cir. 1984); *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

■ A plaintiff may, however, successfully challenge a statute as vague on its face when the statute impinges on constitutionally protected activity and gives unfettered discretion to law enforcement officers to determine whether a given person's conduct violates the statute. *Kolender*, 461 U.S. at 355–58 & n. 8, 103 S.Ct. 1855; *Foti*, 146 F.3d at 639 (invalidating statute prohibiting posting of signs on cars that were "parked to attract attention" because statute impermissibly allowed police to resolve whether statute was violated on "ad hoc basis," creating twin dangers of " 'arbitrary and discriminatory application' ")

(quoting *Grayned*, 408 U.S. at 108–09, 92 S.Ct. 2294). For example, in *Kolender*, the Supreme Court invalidated a state law requiring individuals to show "credible and reliable" identification in response to an officer's request because the statute contained no standard for the individual to determine what type of identification met this requirement. *Id.* at 358, 103 S.Ct. 1855. Consequently, the statute vested "virtual complete discretion" to officers to determine whether, under the given circumstances, an individual's identification was "credible and reliable." *Id.* This "unfettered discretion" in turn created the danger of "arbitrary" suppression of important civil liberties. *Id.*

■ Additionally, a person may challenge a statute as vague on its face when the statute "clearly implicates free speech rights." [7] *Cal. Teachers Ass'n*, 271 F.3d at 1149. But even where a statute clearly implicates free speech rights, the statute will nevertheless survive a facial vagueness attack as long as "it is clear what the statute proscribes 'in the vast majority of its intended applications.' " *Gospel Missions*, 419 F.3d at 1047 (quoting *Cal. Teachers Ass'n*, 271 F.3d at 1151 (citing *Grayned*, 408 U.S. at 112, 92 S.Ct. 2294)). Indeed, even where a law implicates First Amendment rights, the Constitution must tolerate a certain amount of vagueness. *Cal. Teachers Ass'n*, 271 F.3d at 1151.[8] In

---

**7.** Although the Ninth Circuit has repeatedly found facial challenges appropriate when a law "clearly implicates free speech rights," the Ninth Circuit has also held that such challenges are not permitted unless the statute is vague in all of its applications. *See United States v. Adams*, 343 F.3d 1024, 1035 n. 15 (9th Cir.2003) (recognizing conflicting Ninth Circuit authority, as well as conflicting Supreme Court authority, regarding appropriateness of facial vagueness challenge when law "clearly" implicates First Amendment speech rights) (citing *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1347 (9th Cir.1984); *Cal. Teachers Ass'n*, 271 F.3d at 1149; *Foti*, 146

F.3d at 639 n. 10; *Wunsch*, 84 F.3d at 1119 (9th Cir.1996) (some citations omitted)). The Court, however, need not resolve this conflict because, even assuming Plaintiffs can raise a facial vagueness challenge to the EO as "clearly implicat[ing] free speech rights," the EO nevertheless survives Plaintiffs' vagueness challenge.

**8.** Outside the First Amendment context, a statute is unconstitutionally vague on its face only if it is vague in all of its applications. *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 972 (9th Cir.2003) ("Until a majority of the Supreme Court di-

*Cal. Teachers Ass'n,* for example, the plaintiffs raised a facial vagueness challenge to a voter approved initiative mandating school instructors to "overwhelmingly" use the English language in "nearly all" classroom instruction. Even though the Ninth Circuit acknowledged potential ambiguities in the initiative's application, the Court nevertheless rejected Plaintiffs' challenge:

> Undoubtedly, there will be situations at the margins where it is not clear whether a teacher is providing instruction and presenting the curriculum. In these situations, where legitimate uncertainty exists, teachers may feel compelled to speak in English and may forgo some amount of legitimate, non-English speech. The touchstone of a facial vagueness challenge in the First Amendment context, however, is not whether some amount of legitimate speech will be chilled; it is whether a substantial amount of legitimate speech will be chilled.

*Cal. Teachers Ass'n,* 271 F.3d at 1152.

Although not necessarily required for invalidation, a common theme running through the cases in which statutes have been invalidated as facially vague is the use of language that lends itself to subjective interpretation. *See Coates v. City of Cincinnati,* 402 U.S. 611, 612–14, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (finding ordinance prohibiting "conduct ... annoying to persons passing by" was impermissibly

vague); *cf. Gospel Missions,* 419 F.3d at 1047 (rejecting facial vagueness challenge to statute's use of word "charitable" because "charitable" was word of common understanding providing average person notice of permitted and prohibited activity). For example, in *United States v. Wunsch,* 84 F.3d 1110 (9th Cir.1996), the Ninth Circuit held that a court's local rule punishing lawyers for engaging in "offensive personality" was unconstitutionally vague on its face because the term could "refer to any number of behaviors," making it "impossible to know when such behavior would be offensive enough to invoke the statute." *Wunsch,* 84 F.3d at 1119.

Similarly, in *Foti,* the Ninth Circuit invalidated a city ordinance prohibiting individuals from placing signs on vehicles if the vehicles were "parked to attract attention." *Foti,* 146 F.3d at 638. The Ninth Circuit explained that enforcing the ordinance would require the officer to "decipher the driver's subjective intent to communicate from the positioning of tires and the chosen parking spot." *Id.* Such subjective standards of enforcement created the very realistic potential for officers to enforce the statute against only people using their cars to display signs bearing statements that the officers found personally disagreeable. *Id.* at 639.

■ Here, by contrast, the EO's ban on "services" is not vague on its face. First, Plaintiffs' allegations aside, the EO's ban

---

rects otherwise, a party challenging the facial validity of an ordinance on vagueness grounds outside the domain of the First Amendment must demonstrate that 'the enactment is impermissibly vague in all of its applications.' ") (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). Additionally, in *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion), three justices of the Supreme Court suggested that a state statute could be challenged as vague

on its face when vagueness "permeates" the text of the law. *Morales,* 527 U.S. at 55, 119 S.Ct. 1849 (Stevens, J., joined by Ginsburg, R., and Souter, D.). But because this section of the *Morales* opinion did not gather a majority of the Supreme Court, the resulting exception to the general prohibition against facial challenges is questionable at best. Moreover, the three justices that endorsed this exception declined to say whether it would apply if the challenge to the statute had originated in federal court, rather than in state court.

on "services" does not give "unfettered authority" to designate a person or group as an SDGT. While the Regulations' definition of "services" may not be exact, it does not permit subjective standards of enforcement like those permitted by the statute in *Kolender*, which allowed officers to determine on an ad hoc basis whether a given individual's identification was "credible and reliable." Indeed, even the proponents of the statute in *Kolender* conceded that the standards for "credible and reliable" identification changed with the given situation, thereby allowing officers unfettered discretion to determine whether an individual's identification satisfied the statute. By contrast, the EO's definition of "services" is not open to such varying and subjective application. Instead, the word "services" is, by and large, a word of common understanding and one that could not be used for selective or subjective enforcement. Although instances may arise where it is unclear whether the EO prohibits some conduct, this does not mean that the EO provides unfettered discretion as to what constitutes "services." Indeed, the Court is hard-pressed to find an analogous scenario under which "services" could be applied in as subjective a manner as that allowable under the "credible and reliable" standard in *Kolender*.

Second, the EO's ban on "services," while conceivably vague as to some hypothetical conduct, will nevertheless be clear in the vast majority of its intended applications. In the vast majority of cases, any given individual would be able to distinguish when he or she was providing a "service" to a designated terrorist group, as opposed to engaging in independent activity.[9] Tellingly, Plaintiffs cite no examples, other than their own proposed conduct, where the EO would be vague as to its intended applications. But as explained earlier, Plaintiffs' proposed conduct is clearly prohibited by the Executive Order. And to the extent that Plaintiffs contend that the EO's ban on "services" might be interpreted to preclude independent advocacy or activity, such an interpretation would be unreasonable. On the contrary, as explained earlier, the Government concedes that the EO's ban on "services" does not prohibit independent activity or advocacy.

Finally, Plaintiffs' insistence that the Court's prior order controls the outcome here ignores the differences between their challenges to the AEDPA in the previous case and their challenges to the EO in this case. In their challenge to the AEDPA, Plaintiffs alleged that the statute's use of the word "service" was vague as applied to the conduct in which they intended to participate. Specifically, Plaintiffs argued that they could not determine whether the AEDPA's ban on "service" prohibited them from "teaching international law for peacemaking resolutions or how to petition the United Nations to seek redress for human rights violations." *Humanitarian Law Project*, 380 F.Supp.2d at 1150. To the extent that Plaintiffs argued that the AEDPA's ban on "service" was vague on its face, the Court did not address this argument.[10] In this case, by contrast, Plaintiffs challenge the EO's ban on "ser-

---

**9.** This assumes, of course, that the given individual knows that the given group has been designated as a terrorist group. *See Cal. Teachers Ass'n*, 271 F.3d at 1151 ("It is sufficient to note that 'instruction' and 'curriculum' are words of common understanding to which no teacher is a stranger.") (citing *Grayned*, 408 U.S. at 112, 92 S.Ct. 2294).

**10.** In its previous Order, the Court noted: "Defendants' contention that Plaintiffs lack

standing to attack AEDPA for vagueness based on mere hypothetical situations ignores Plaintiffs' submitted evidence of their intended conduct. *Plaintiffs do not seek injunctive relief as to hypothetical activities, but as to their own.*" *Humanitarian Law Project*, 380 F.Supp.2d at 1149 n. 21 (emphasis added). Although Plaintiffs' briefs in support of its last challenge to the AEDPA may have stated in passing that the ban on "service" was vague on its face (*see, e.g.*, Pls.' Opp'n to Defs.' Mot.

vices" both as applied to their proposed conduct and on its face. Accordingly, any argument that the Court's current Order somehow contradicts the Court's prior Order evidences a misreading of the Court's prior Order.

In short, given the clarity of the EO's ban on "services" in the vast majority of its intended applications, it is unlikely to inhibit a substantial amount of First Amendment activity. As such, facial invalidation is not warranted. *See Cal. Teachers,* 271 F.3d at 1152.

### 2. Overbreadth

■ "The First Amendment doctrine of overbreadth is an exception to [the] normal rule regarding the standards for facial challenges." *Virginia v. Hicks,* 539 U.S. 113, 118, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003). Under the overbreadth doctrine, a "showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep, suffices to invalidate all enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *Id.* at 118–19, 123 S.Ct. 2191 (internal quotation marks and citations omitted).

However, the Supreme Court has recognized that "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" *Id.* at 119, 123 S.Ct. 2191 (citations omitted). Accordingly, the Supreme Court requires that the "law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications before applying the 'strong medicine' of the overbreadth invalidation." *Id.*

■ In its previous Order, the Court rejected Plaintiffs' overbreadth challenge to the AEDPA's ban on "service." Although the Court's previous Order is not controlling in this case as to Plaintiffs' vagueness challenge, it is instructive as to their overbreadth challenge. As with their overbreadth challenge to the AEDPA's ban on "service," Plaintiffs have failed to establish that the EO's ban on "services" is substantially overbroad. Indeed, it is content-neutral and serves the legitimate purpose of deterring groups and individuals from providing services to foreign terrorist organizations.[11] "Further, the [EO's] ap-

for Summ. J., Case Nos. CV 98–1971 ABC and CV 03–6107 at 6), the Court plainly did not address this argument in its previous Order. Instead, the Court found only that the ban on "service" was vague as applied to Plaintiffs' proposed conduct of "teaching international law for peacemaking resolutions or how to petition the United Nations to seek redress for human rights violations." *Humanitarian Law Project,* 380 F.Supp.2d at 1150, 1152. The Court did not, however, apply the "strong medicine" of facial invalidation to the AEDPA's ban on "service." *See Gospel Missions,* 419 F.3d at 1047 (citing *Cal. Teachers Ass'n,* 271 F.3d at 1155). Indeed, the Court could not have found the AEDPA's ban on "service" facially invalid, as the Court specifically limited its injunction on enforce-

ment of the ban on "service" only to Plaintiffs' proposed conduct, as opposed to the entire nation. *See Humanitarian Law Project,* 380 F.Supp.2d at 1156 (enjoining Defendants from, among other things, enforcing the AEDPA's ban on providing "service" to the PKK and LTTE "against any of the named Plaintiffs or their members," but declining to grant a nationwide injunction).

11. Although Plaintiffs argue that the EO's ban on "services" is content-based, this argument lacks merit. The ban does not distinguish between "good" or "bad" services; rather, it prohibits the provision of all services to SDGTs.

plication to protected speech is not 'substantial' [either] in an absolute sense or relative to the scope of [its] plainly legitimate applications. The Court, therefore, declines to apply the 'strong medicine' of the overbreadth doctrine, finding instead that as-applied litigation will provide a sufficient safeguard for any potential First Amendment violation." *Humanitarian Law Project*, 380 F.Supp.2d at 1153.

## B. Plaintiffs' Vagueness Challenge to the Term "Specially Designated Terrorist Group"

Next, Plaintiffs challenge the term "specially designated global terrorist," as used in both the EO and its Regulations. Plaintiffs note that this term is nowhere to be found in the IEEPA. Moreover, they contend that neither the EO nor the Regulations define the term or set criteria for designating an individual or group as a "specially designated terrorist group." According to Plaintiffs, this allows the President unfettered discretion to designate any individual or group as a "specially designated global terrorist" for any reason he or she sees fit.

Plaintiffs' challenge to the EO's use of the term "specially designated terrorist group" lacks merit. First, contrary to Plaintiffs' argument, the Regulations define the term "specially designated terrorist group." Specifically, the Regulations define "specially designated terrorist group" as "any foreign person or person listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001." 31 C.F.R. § 594.310. Moreover, even if it lacked a definition, the term "specially designated terrorist group" is nothing more than shorthand for groups or individuals designated under the EO, as opposed to groups designated under other executive orders. *See* Decl. of Barbara C. Hammerle ¶ 25.[12] Thus, Plaintiffs' allegations aside, this term is not vague.

Second, Plaintiffs' argument overlooks the limited circumstances under which the IEEPA affords the Executive any power. Indeed, before the Executive may take any action under the IEEPA, he or she must first declare a national emergency. And furthermore, any action the Executive takes under the IEEPA's grant of authority must relate to that identified emergency. This, coupled with the limited circumstances described below under which a person may be designated under the EO, ensures that the designating authorities are not afforded "unfettered discretion" in designating groups or individuals as SDGTs.

Third, the EO provides adequate criteria for designating an individual or group as an SDGT. *See Islamic Am. Relief Agency v. Unidentified Agents*, 394 F.Supp.2d 34, 46 (D.D.C.2005) (finding that EO "clearly designates procedures for designating organizations as SDGTs"). In particular, the EO requires the secretary of the treasury to make specific findings before designating any group or individual as an SDGT. EO § 1(b)—(d)(ii). For example, the secretary of the treasury may designate a person as an SDGT if the secretary determines that the person has committed, or poses a significant risk of committing, acts of terrorism that "threaten the security of United States nationals or national securi-

---

12. In her declaration, Ms. Hammerle explains:

> OFAC uses the terms "specially designated global terrorist" and "SDGT" to distinguish a designation pursuant to E.O. 13224 from designations made pursuant to other legal authorities.... Similarly, OFAC refers to persons designated pursuant to Executive

Order 12978 as "specially designated narcotics traffickers" or "SDNTs."

Decl. of Barbara Hammerle ¶ 25. Plaintiffs object to the Hammerle declaration and ask the Court not to consider the statements therein. The Court OVERRULES Plaintiffs' objection.

ty, foreign policy, or [the] economy of the United States." EO § 1(b). Additionally, the secretary of the treasury may designate a person as an SDGT if the secretary determines that the person is "owned or controlled by, or . . . act[s] for or on behalf of" other SDGTs. EO § 1(c). Finally, the secretary of the treasury may designate a person as an SDGT if the secretary determines that the person has assisted in, has sponsored, or has provided "financial, material, or technological support for, or financial or other services to or in support of," acts of terrorism or other SDGTs. EO § 1(d)(i). These provisions of the EO, like the analogous provisions of the AEDPA, set forth adequate criteria for the secretary of the treasury to exercise his discretion in designating individuals and groups as SDGTs.

The EO, however, also authorizes the secretary of the treasury to designate an individual or group as an SDGT if the secretary finds the given individual "to be otherwise associated with" an SDGT. EO § 1(d)(ii). This provision, as Plaintiffs correctly note, contains no definable criteria for designating individuals and groups as SDGTs. However, the constitutionality of the "otherwise associated with" provision will be discussed separately, below.

Finally, although Plaintiffs insist otherwise, the EO and its Regulations provide a procedure for designated groups to challenge any designation made under the EO and its Regulations. Specifically, a designated person or group may "seek administrative reconsideration" of the designation under 31 C.F.R. § 501.807. Furthermore, a designated person or group may also "propose remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for designation." 31 C.F.R. § 501.807(a). Additionally, upon receiving a request for re-

consideration, the Office of Foreign Assets Control must review the request and "provide a written decision to the blocked person. . . ." *Id.* at § 501.807(d). These procedures provide sufficient safeguards to which aggrieved parties may avail themselves.

Accordingly, Plaintiffs' challenges to the term "specially designated terrorist group" and to the EO's designation procedure both fail.

## B. Plaintiffs' Vagueness Challenge to the President's Designation Authority

Plaintiffs point out that in addition to the designation authority that the President delegated to the secretary of the treasury, in the EO the President himself designated twenty-seven groups and individuals as SDGTs. Plaintiffs contend that regardless of the merits of the designation authority delegated to the secretary of treasury, this Presidential designation authority is unconstitutional. Specifically, they contend that these designations were made without any explanation of the criteria used, and that the EO provides no process by which the groups can challenge their designations. In addition, the President retains the authority to make similar designations at any time in the future, thus subjecting Plaintiffs to the risk that they too are subject to being similarly designated. Accordingly, Plaintiffs contend that the President's designation authority is unconstitutionally vague.

 Plaintiffs present a strong facial challenge to the President's designation authority. Indeed, the EO provides no explanation of the basis upon which these twenty-seven groups and individuals were designated, and references no findings akin to those the secretary of treasury is required to make.

In addition, the procedures for challenging designations made by the secretary of

treasury are not clearly available with regard to designations made by the President. In short, the criteria and processes discussed above that apply to the delegated designation authority, and that help ensure its constitutionality, do not appear to apply to the President's designation authority. Rather, the President's designation authority is subject only to his unfettered discretion. Finally, nothing in the EO appears to divest the President of his authority to make additional designations.

The Government has offered no argument demonstrating how the President's designation authority is constrained in any manner. Rather, the Government contends only that Plaintiffs' fear of punishment derives from their association with groups that were designated not by the President, but by the secretary of state pursuant to delegated authority. However, this attempt to challenge Plaintiffs' standing fails to meet Plaintiffs' argument, which is that they may be subject to designation under the President's authority for any reason, including for associating with the PKK and the LTTE, for associating with anyone listed in the Annex, or for no reason. Because the President has used his designation authority in the past, and because there is no apparent limit on his ability to continue to do so, Plaintiffs have standing to bring their constitutional challenge for the same reasons as discussed in section C, *infra*.

Accordingly, the President's designation authority is unconstitutionally vague.

### C. Plaintiffs' Challenge to the EO's Ban on Being "Otherwise Associated With" an SDGT

Plaintiffs also challenge the constitutionality of the EO provision proscribing groups and individuals from being "otherwise associated with" an SDGT. *See* EO § 1(d)(ii). This "otherwise associated with" provision, according to Plaintiffs, is overbroad because it directly impinges on their First Amendment right to freedom of association. For example, Plaintiffs contend that they themselves risk being designated as an SDGT if they "so much as 'associate' with the PKK and the LTTE." Pls.' Mem. at 19. Furthermore, they assert that the provision is so vague that it could punish independent activity and encourage arbitrary enforcement. Relatedly, Plaintiffs posit that the term "otherwise associated" is so inherently vague that an average person of reasonable intelligence could not determine which conduct falls within the provision's proscriptions and which does not.

In response, the Government does not address whether the "otherwise associated with" provision is unconstitutionally vague, but instead contends only that the Court should dismiss this claim and not reach its merits on the ground that the Plaintiffs lack standing to bring it. Specifically, the Government contends that Plaintiffs lack standing because they have not suffered an injury in fact.[13]

---

**13.** The parties use the terms "ripeness" and "standing" interchangeably in arguing for and against Plaintiffs' ability to maintain their challenge to the "otherwise associated with" provision. While ripeness and standing relate to analytically distinct concepts, both determinations depend on whether the plaintiff has suffered an "injury-in-fact." Further, the Ninth Circuit test for injury-in-fact is the same regardless of whether it is part of a ripeness or standing analysis:

We have noted that the ripeness inquiry contains both a constitutional and a prudential component, and that the constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry.... Regardless of how we characterize our discussion, the inquiry is the same: we ask whether there exists a constitutional "case or controversy" and whether the issues presented are definite and concrete, not hypothetical or abstract.

### 1. Standing

"To satisfy the Article III case or controversy requirement, [a plaintiff] must establish, among other things, that it has suffered a constitutionally cognizable injury-in-fact." *Cal. Pro–Life Council, Inc. v. Getman,* 328 F.3d 1088, 1093 (9th Cir.2003). "[N]either the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1139 (9th Cir.2000) (en banc).

Generally, a plaintiff lacks standing to challenge a law unless the plaintiff can establish a "genuine threat of imminent prosecution." *Thomas,* 220 F.3d at 1139. In evaluating the genuineness of a claimed threat of prosecution, courts consider three factors: (1) whether the plaintiff has articulated a "concrete plan" to violate the law in question; (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings; and (3) the history of past prosecution or enforcement under the challenged statute. *Id.*

Although these three factors guide a court's standing analysis even when a plaintiff challenges a law on First Amendment grounds, standing is relaxed in such instances. "[P]articularly in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements ... [and] ... has endorsed a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Cal. Pro–Life Council,* 328 F.3d at 1094. This lower threshold suffices to establish injury in fact in the First Amendment context because the "alleged danger of the

statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Virginia v. American Booksellers Assn., Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). *See also Cal. Pro–Life Council,* 328 F.3d at 1095 (characterizing self-censorship as a constitutionally recognized injury). Thus, Plaintiffs have standing to bring their First Amendment challenge if the conduct they seek to engage in "arguably falls within the statute's reach." *Cal. Pro-Life Council,* 328 F.3d at 1095.

This does not mean, however, that standing in First Amendment cases is automatic whenever a plaintiff alleges that a given law chills his or her speech. *Id.* at 1095. Rather, the plaintiff must still, at a minimum, show a " 'credible threat' " that the challenged provision will be invoked against the plaintiff. *Id.* (quoting *Ariz. Right to Life PAC v. Bayless,* 320 F.3d 1002, 1006 (9th Cir.2003)). However, in order to be a "credible" threat of enforcement, the threat need not be express. Rather, "[a] plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute. [If the statute] arguably covers [plaintiff's conduct], and so may deter constitutionally protected expression ... there is standing." *Id.* (quoting *Majors v. Abell,* 317 F.3d 719, 721 (7th Cir.2003)).

Plaintiffs herein have demonstrated that they have standing to challenge the "otherwise associated with" provision. First, in a previous order, the Court found that Plaintiffs sufficiently established a

*Cal. Pro–Life Council, Inc.,* 328 F.3d at 1094 n. 2 (citations and internal quotations omitted). Thus, for convenience and consistency of language, and because the test is the same whether under ripeness or standing, the Court will identify this as an issue of standing.

definite intention to engage in activity that would or could violate the EO's ban on being "otherwise associated with" an SDGT. *See Humanitarian Law Project,* 380 F.Supp.2d at 1141. Specifically, Plaintiffs have been providing educational training, medical services and advice, economic development assistance, and humanitarian aid to the PKK and/or the LTTE. Plaintiffs are therefore clearly associating with the PKK and the LTTE, which are SDGTs under the EO. The EO provides that any person may himself or herself be designated as an SDGT for being "otherwise associated with" an SDGT.

The Court notes that it is not clear whether Plaintiffs' activities fall squarely within the scope of the "otherwise associated with" provision, or whether Plaintiffs' activities fall under other provisions of the EO that the Plaintiffs challenge. However, that ambiguity is a consequence of the lack of definition in the EO itself, rather than an uncertainty in the nature of Plaintiffs' activities. Taken as a whole, it is clear that Plaintiffs' activities entail a variety of interactions with the PKK and the LTTE that may well be construed as "otherwise associating" with those groups. Accordingly, the EO at a minimum "arguably covers" Plaintiffs' conduct.

Second, Plaintiffs face a credible threat that the EO will be enforced against them, and that they will be designated as SDGTs for being "otherwise associated with" the PKK and the LTTE. Their activity falls within the purview of the provision, and the provision has been enforced in the recent past.

In its initial briefing, the Government's primary argument against standing was that, based on the Hammerle Declaration, the "otherwise associated with" provision had "never been used as the sole legal basis for a blocking designation," and that, accordingly, Plaintiffs faced no credible threat of enforcement. Defs.' Mem. in Supp. Motion to Dismiss at 23:14–16. *See Western Mining Council v. Watt,* 643 F.2d 618, 624, 627 (9th Cir.1981) (holding that plaintiff presented no justiciable case or controversy where the laws that plaintiff challenged had never been "applied or threatened to be applied to them or anyone else.")

However, with its supplemental brief, the Government submitted a First Supplemental Declaration of Barbara C. Hammerle, in which Ms. Hammerle repudiated the factual basis of the Government's legal argument. Ms. Hammerle now states that she "ordered OFAC to review the administrative records supporting the designation of all SDGTs" and now understands that "the 'associated with' criterion was identified as the sole legal basis for designation in two of the 375 SDGT designations." First Suppl. Hammerle Decl. ¶¶ 6, 7. One administrative record supporting the designation of four foreign persons could not be located in time for her declaration. *Id.* ¶ 6. In light of this admission that at least two groups were designated as SDGTs solely on the basis of the "otherwise associated with" provision, the Court finds that Plaintiffs have demonstrated a credible threat that the same provision will be enforced against them.

The Government offers various arguments in an attempt to mitigate the significance of the "otherwise associated with" designations. Specifically, the Government contends that these designations were made more than five years ago (on October 12, 2001), and that other grounds existed upon which the groups could have been designated. However, absent a disavowal by the Government of any intention to enforce this provision in the future, the passage of five years does not alone operate to render the possibility of enforcement not credible, especially in light of the relaxed standing requirement that applies

in this First Amendment context. *See, e.g., Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 302, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (where there was no evidence that a criminal penalty provision that impinged on First Amendment rights had ever been enforced, Court finds standing, noting "the State has not disavowed any intention of invoking the criminal penalty provision ... Appellees are thus not without some reason in fearing prosecution..."). Further, even if other grounds may have existed for designating the two groups, OFAC nevertheless did rely solely upon the "otherwise associated with" provision. This is sufficient to constitute a credible threat to Plaintiffs.

The third component of the injury-in-fact analysis focuses on the history of enforcement. As discussed above, the fact that the "otherwise associated with" provision has been the sole basis of at least two SDGT designations suffices to demonstrate that the provision has been enforced.

Accordingly, Plaintiffs have standing to bring their challenge to the "otherwise associated with" provision.

### 1. Vague on Its Face

■■ As mentioned, the Government made no attempt to defend the constitutionality of the provision.[14] Rather, the Government's sole argument for denying Plaintiffs' challenge to this section is that Plaintiffs lack standing. Having rejected the Governments' standing argument, the Court finds that the prohibition on being "otherwise associated with" an SDGT on its face unconstitutionally intrudes upon activity protected by the First Amendment.

First, the term "otherwise associated" is not itself susceptible of a clear meaning. Nor does the provision mitigate the vagueness of the term by supplying any definition. Indeed, as Plaintiffs point out, the provision contains no definition of the term whatsoever. Accordingly, the provision lends itself to subjective interpretation. *See Coates,* 402 U.S. at 612–614, 91 S.Ct. 1686 (finding ordinance prohibiting "conduct ... annoying to persons passing by" was impermissibly vague.)

Second, and relatedly, unlike the term "services", discussed *infra,* the "otherwise associated with" provision contains no definable criteria for designating individuals and groups as SDGTs. Thus, the provision on its face gives the Government unfettered discretion in enforcing it.

Accordingly, the "otherwise associated with" provision is unconstitutionally vague on its face.

### 2. Overbreadth

As discussed above, a law is overbroad if it punishes a substantial amount of protected conduct judged in relation to the statute's legitimate sweep, until and unless the law is narrowed to remove the threat. *See Virginia v. Hicks,* 539 U.S. 113, 118, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003).

■■ Plaintiffs argue persuasively that the "otherwise associated with" provision is unconstitutionally overbroad because it punishes mere association with an SDGT. It is axiomatic that the Constitution forbids punishing a person for mere association. "[T]he First Amendment protects a citizen's right to associate with a political organization; even if that association in-

---

**14.** While the Government's failure to defend the merits of Plaintiffs' challenge does not necessarily mean that the Government concedes that the provision would not pass constitutional muster, it is nevertheless significant. Indeed, in the past, whenever the Government contested Plaintiffs' standing to challenge a provision of the AEDPA, it also consistently argued that the given provision did not violate the Constitution.

cludes ties with groups that advocate illegal conduct or engage in illegal acts, the power of the Government to penalize association is narrowly circumscribed." *American–Arab Anti–Discrimination Committee v. Reno,* 70 F.3d 1045, 1066 (9th Cir. 1995). " '[G]uilt by association alone' ... is an impermissible basis upon which to deny First Amendment rights." *Healy v. James,* 408 U.S. 169, 186, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *see also United States v. Robel,* 389 U.S. 258, 264–65, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (finding that "guilt by association alone," even in the name of national defense, violates the First Amendment). Rather, the government must "establish [the individual's] knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims." *Healy,* 408 U.S. at 186, 92 S.Ct. 2338. Therefore, "the critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not." *Id.* at 192, 92 S.Ct. 2338

 Here, it is facially clear, and the Government offers no argument to the contrary, that the "otherwise associated with" provision imposes penalties for mere association with an SDGT. There is nothing in the provision purporting to limit its application only to those instances of association also involving activity, let alone activity that furthers or advances an organization's illegal goals.

The provision's overbreadth is also substantial. For example, to the extent to which the provision reaches activity, as opposed to mere association, that activity is likely also covered by other provisions of the EO, such as the provision banning "services." Thus, the potentially legitimate scope of the "otherwise associated with" provision is already captured in other provisions that are not unconstitutional. Relatedly, to the extent to which the scope of the "otherwise associated with" provision does not duplicate the scope of other provisions, it likely reaches only mere association. Indeed, the EO itself presents the "otherwise associated with" provision as a catch-all, to reach conduct that is not specified in previous provisions.

Accordingly, the "otherwise associated with" provision is unconstitutionally overbroad.

### D. Plaintiffs' Challenge to the Regulations' Licensing Provision

Plaintiffs also challenge the licensing authority set forth in the EO's Regulations. *See* 31 C.F.R. §§ 501.801–02. Under that authority, the Office of Foreign Assets Control ("OFAC") may grant licenses to engage in otherwise prohibited transactions in property with blocked persons or organizations. This authority, according to Plaintiffs, violates the First and Fifth Amendments because it lacks any procedural or substantive safeguards, thereby giving the OFAC unfettered discretion to grant or deny licenses.

 The Court does not reach the merits of this argument because Plaintiffs lack standing to challenge the licensing scheme.[15] A party invoking federal juris-

---

**15.** Contrary to Plaintiffs' assertions, the Court never found that Plaintiffs had standing to challenge the licensing provision of the AEDPA. On the contrary, the Court noted that Defendants had raised a "sound argument" that Plaintiffs lacked standing to challenge that provision of the AEDPA. *Humanitarian Law Project,* 380 F.Supp.2d at 1154 n. 27 ("Defendants assert that Plaintiffs lack stand-

ing to bring this claim because they are not harmed by the exception set forth in 18 U.S.C. § 2339B(j). The Court agrees that Defendants have asserted a sound argument regarding standing."). To the extent that the Court chose to address and reject the merits of Plaintiffs' challenge to the AEDPA's licensing provision, it did so only because Plaintiffs' argument so clearly lacked merit.

diction bears the burden of meeting the three elements that constitute the " 'irreducible constitutional minimum' of Article III standing." *San Diego County Gun Rights Comm.*, 98 F.3d at 1126 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "First, plaintiffs must have suffered an 'injury-in-fact' to a legally protected interest that is both 'concrete and particularized' and 'actual or imminent,' as opposed to 'conjectural' or 'hypothetical.' Second, there must be a causal connection between their injury and the conduct complained of. Third, it must be 'likely'—not merely 'speculative'—that their injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (citations omitted)).

■■■ In this case, Plaintiffs cannot satisfy any of these three requisite elements in their challenge to the EO's licensing provision. First, they have not been denied a license under the licensing provision. Indeed, they have not even applied for a license.[16] Second, no casual connection exists between the licensing provision and Plaintiffs' injury. Rather, Plaintiffs' alleged injury stems from the EO's ban on providing "services" to the PKK and LTTE, not from the OFAC's ability to grant or deny licenses to engage in otherwise prohibited transactions with designated groups and individuals. Finally, even if the Court declares the licensing provision unconstitutional, Plaintiffs' injury would not be redressed. On the contrary, if the licensing scheme is invalidated, Plaintiffs will be in the same position that they are in now: they will still be unable to aid the

PKK and LTTE in the ways in which Plaintiffs have identified.[17] In fact, Plaintiffs would be worse off if their challenge to the licensing scheme succeeded. Such a result would preclude them from even applying for a license to engage in otherwise prohibited conduct—an option that is still open to them.

In short, Plaintiffs lack standing to maintain their challenge to the licensing provision.

**E. Plaintiffs' Constitutional Avoidance Arguments**

Plaintiffs offer the Court two alternatives to avoid reaching any of their constitutional challenges to the EO. First, they ask the Court to construe the IEEPA to authorize sanctions against foreign nations and against individuals thereof only as an incident to that authority. (Pls.' Opp'n and Reply on Cross–Motion for Summ. J. at 21.) This construction of the statute, according to Plaintiffs, would make clear that the IEEPA was meant to be a "tool for nation-to-nation diplomacy." (*Id.*) Furthermore, Plaintiffs' proposed construction would exempt them from the reach of the EO, as any sanctions against Plaintiffs would not be "incident to" the IEEPA's authority to sanction foreign nations.

Second, Plaintiffs ask the Court to read a specific intent requirement into the EO. Specifically, they urge the Court to interpret the EO so as to preclude any civil or criminal penalties unless a targeted group or individual specifically intended to further the illegal activities of an SDGT.

---

**16.** Likewise, Plaintiffs have not been designated as SDGTs. Accordingly, no group has applied for or been denied a license to engage in otherwise prohibited transactions with Plaintiffs.

**17.** To the extent that Plaintiffs believe that an order declaring the licensing provision unconstitutional would require the entire EO and its Regulations to be struck down, they are mistaken. If the Court had found the licensing provision unconstitutional, the Court would have severed this provision from the other provisions and Regulations of the EO.

The Court, however, declines Plaintiffs' invitation to so construe the IEEPA or the EO, as it sees no reason to read additional terms and limitations into either the IEEPA or the EO. Furthermore, the EO makes clear that President Bush did not intend to include a "specific intent" requirement for designating individuals and groups under the EO. Indeed, the EO prohibits even the provision of humanitarian aid.

Accordingly, the Court rejects Plaintiffs' proposed interpretations of the IEEPA and the EO.

## CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Plaintiffs' Motion for Summary Judgment, and GRANTS in part and DENIES in part Defendants' Motion to Dismiss and GRANTS in part and DENIES in part Defendants' Cross–Motion for Summary Judgment, as follows:

1. The Court finds that Plaintiffs have standing to challenge the President's authority to designate SDGTs under Executive Order 13224. The Court therefore DENIES Defendants' Motion to Dismiss on this ground.

2. The Court finds that the President's authority to designate SDGTs under Executive Order 13224 is unconstitutionally vague on its face. The Court therefore GRANTS Plaintiffs' Motion for Summary Judgment on this ground.

3. The Court finds that Plaintiffs have standing to bring their First Amendment challenge to Executive Order 13224, § 1(d)(ii), the "otherwise associated with" provision. The Court therefore DENIES Defendants' Motion to Dismiss on this ground.

4. The Court finds that Executive Order 13224, § 1(d)(ii), the "otherwise associated with" provision, is unconstitutionally vague on its face and overbroad. The Court therefore GRANTS Plaintiffs' Motion for Summary Judgment on this ground.

5. In all other respects, Plaintiffs' Motion for Summary Judgment is DENIED, and Defendants' Motion to Dismiss and Cross–Motion for Summary Judgment is GRANTED.

Accordingly, Defendants, their officers, agents, employees, and successors are ENJOINED from (1) designating any of the Plaintiffs as SDGTs pursuant to the President's authority under Executive Order 13224 to make such designations; and (2) enforcing Executive Order 13224, § 1(d)(ii), against any of the Plaintiffs by blocking their assets or subjecting them to designation as SDGTs for being "otherwise associated with" the PKK or the LTTE.[18] The Court declines to grant a nationwide injunction.

**IT IS SO ORDERED.**

---

18. This Court's injunction does not enjoin the enforcement of any other portions of the Executive Order against Plaintiffs.