UNITED STATES of America,
Appellee,

v.

HOMA INTERNATIONAL TRADING
CORP., Defendant,

Mazyar Gavidel, Defendant–Appellant.

No. 03–1375.

United States Court of Appeals,
Second Circuit.

Argued: June 15, 2004.

Decided: Oct. 22, 2004.

James E. Neuman, Mischel Neuman &
Horn, P.C., New York, NY, for Defen-
dant–Appellant.

Peter B. Sobol, Assistant United States
Attorney (David N. Kelley, United States
Attorney for the Southern District of New
York, Peter G. Neiman, Assistant United
States Attorney, on the brief), New York,
NY, for Appellee.

Before: WALKER, Chief Judge, B.D.
PARKER and WESLEY, Circuit Judges.

PER CURIAM.

Defendant-appellant Mazyar Gavidel appeals from the district court's judgment of conviction, dated May 30, 2003, following a jury trial in which Gavidel and Homa International Trading Corp. ("Homa"), a Manhattan business owned and operated by Gavidel, were found guilty of the following crimes: conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h); laundering purported narcotics proceeds, in violation of 18 U.S.C. § 1956(a)(3)(B); and violating a trade embargo against Iran (the "Embargo") by transferring $277,045 from the United States to Iran, in violation of 50 U.S.C. §§ 1702, 1705(b), Executive Order 12959, and 31 C.F.R. §§ 560.203, 560.204, and 560.406(b). Gavidel was also convicted of structuring cash transactions (totaling $614,806) to avoid reporting requirements, in violation of 31 U.S.C. § 5324(a)(1) and (c)(2).[1] Although he claimed entrapment, Gavidel did not call witnesses or submit evidence in his defense. At sentencing, Judge Griesa ordered Gavidel to forfeit $614,000 and sentenced him to seventy months' imprisonment, followed by three years' supervised release, and a mandatory $800 special assessment.

The Government launched its investigation of Gavidel and his company in the fall of 1999, after agents of the U.S. Customs Service received a tip that Gavidel was laundering drug money. The investigation included a sting operation, during which a confidential informant (the "C.I.") hired Gavidel to help him launder funds, purportedly from the sale of illegal narcotics, through Homa. At trial, the Government established that from November 1999 through August 2000, Gavidel laundered the C.I.'s money by wiring hundreds of thousands of dollars he believed were the C.I.'s narcotics proceeds to bank accounts in London.

Before wiring the money overseas, Gavidel made cash purchases of small-denomination money orders and then deposited those money orders in a Homa bank account. Testimony at trial established that postal officials must record purchases of money orders in excess of $3,000, and that it is illegal to purchase money orders in amounts less than $3,000 to evade reporting requirements. During an eighteen-month period, Gavidel deposited 882 postal money orders, each valued at less than $3,000, with a total value of $614,459 into a Homa bank account in the United States. Gavidel's girlfriend testified that she purchased numerous money orders several times per week at Gavidel's direction. On a number of occasions, Gavidel accompanied her and purchased money orders also.

In addition to these illicit activities, Gavidel violated the Embargo in the summer of 2000 by indirectly transferring money into bank accounts in Iran. The Government established its case in this regard by offering as evidence Gavidel's faxes. The faxes indicated correspondence between Gavidel, his brother in Iran, and third parties planning and implementing the transfer of funds from the United States to bank accounts in Iran via Dubai, U.A.E. They also depicted copies of deposit tickets and statements from Iranian banks. On two occasions, Gavidel's bank declined transfer requests involving Gavidel's account when the bank suspected that Gavidel was attempting to funnel money to

---

1. The jury did not reach a verdict on two other crimes charged in the indictment. First, it did not decide whether Gavidel and Homa knowingly conducted an "unlicensed money transmitting business," in violation of 18 U.S.C. § 1960. Second, the jury did not determine whether Gavidel trafficked motor vehicles with impaired identification numbers, in violation of 18 U.S.C. § 2321.

Iran. On both occasions, the Treasury Department's Office of Foreign Assets Control ("OFAC") issued a letter to Gavidel inquiring of his business relations with Iran and referencing Treasury Department regulations relating to the Embargo.

On appeal, Gavidel argues that (1) the district court erred in admitting as hearsay evidence an informant's assertion that Gavidel had been involved in laundering narcotics money; (2) the district court's curative instruction, to the effect that no attempt had been made to present to the jury all of the information the Government had obtained in its initial investigation of Gavidel, impermissibly bolstered the Government's case and undermined Gavidel's entrapment defense; (3) the district court erred by not *sua sponte* charging the jury on the possibility of multiple conspiracies; (4) there was insufficient evidence to demonstrate that Gavidel's money-transfer services were "services" prohibited by the specific Embargo regulations cited in the indictment; and (5) the district court's instruction to the jury on the element of willfulness, as it relates to Gavidel's breach of the Embargo, was erroneous. The district court's proper resolution of Gavidel's first three arguments does not necessitate further comment by this Court. We disagree with Gavidel's latter two arguments for the reasons stated in the following discussion.

## DISCUSSION

■ The Embargo prohibits the "exportation, ... directly or indirectly, from the United States ... of any goods, technology, or services to Iran." 31 C.F.R. § 560.204. In our view, the execution on behalf of others of money transfers from the United States to Iran is a "service" under the terms of the Embargo. The term "services" is unambiguous and refers to the performance of something useful for

a fee. *See United States v. All Funds on Deposit in United Bank of Switzerland,* 2003 WL 56999, at *1 (S.D.N.Y. Jan. 7, 2003) ("*All Funds* ") (Rakoff, J.).

This plain interpretation of the meaning of "services" is corroborated by the Iranian Transaction Regulations, which permit qualifying depository institutions to execute certain specified types of money transfers to Iran. Under those regulations, depository institutions may transfer funds to or from Iran if the transfer arises from a non-prohibited transaction, such as a family remittance unrelated to a family business, and does not involve debiting or crediting an Iranian account. *See* 31 C.F.R. § 560.516(a)(3). Certainly, if the provision of money transfers were not a service under the Embargo, as Gavidel argues, there would be no need for the exception.

The Embargo's prohibition on the exportation of services applies "where the benefit of such services is ... received in Iran, if such services are performed ... [i]n the United States." 31 C.F.R. § 560.410(a). Plainly, the individual or entity in Iran that received the transferred funds benefited from Gavidel's services.

> The obvious purpose of the order is to isolate Iran from trade with the United States. . . . This broad export ban reflected the President's appraisal of the nation's interest in sanctioning Iran's sponsorship of international terrorism, its frustration of the Middle East peace process, and its pursuit of weapons of mass destruction.

*United States v. Ehsan,* 163 F.3d 855, 859 (4th Cir.1998). Gavidel's activities—transferring a customer's money to Iran for a fee—clearly fall within the sweep of the statute.

■ We also reject Gavidel's challenge to the district court's jury instruction on the willfulness requirement for criminal

liability under the Embargo. "[T]o establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191–92, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (internal quotation marks omitted). The district court properly instructed the jury that it could not convict Gavidel of violating the Embargo unless "the defendant knew that such transmission of funds was a violation of the Iranian embargo, and was, thus, illegal." The instruction clearly articulated that Gavidel had to violate knowingly the Embargo.

█ Furthermore, we reject Gavidel's challenge to the sufficiency of the evidence of his willfulness to violate the Embargo. On two occasions, Gavidel's bank refused to complete questionable transactions. Following each of these incidents, OFAC wrote letters to Gavidel inquiring of his business purposes and alerting him to the Embargo's regulations. Moreover, Gavidel conducted his business practices in stealth, using code words to reference money transfers. Sometimes he described his clandestine transactions in terms of the sale of newspapers; other times he surreptitiously referred to the sale of tea.[2] This activity clearly confirms that Gavidel knew his activities ran afoul of the law.

## CONCLUSION

Accordingly, we affirm the district court's judgment.

---

**2.** Gavidel asserts that the district court issued fatally flawed jury instructions when it failed to instruct the jury that, in order to establish Gavidel's willfulness to violate the Embargo, the Government was required to prove that Gavidel knew he was not a depository institu-

tion entitled to avail itself of an expressed exception to the Embargo. Gavidel's argument fails because the law does not require such a negative finding by the jury to establish willfulness. *See Bryan*, 524 U.S. at 191–96, 118 S.Ct. 1939.