**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HUMANITARIAN LAW PROJECT;
RALPH FERTIG; ILANKAI THAMIL
SANGAM; TAMIL WELFARE AND
HUMAN RIGHTS COMMITTEE; WORLD
TAMIL COORDINATING COMMITTEE;
NAGALINGAM JEYALINGAM,
        *Plaintiffs-Appellants,*

v.

UNITED STATES TREASURY
DEPARTMENT; TIMOTHY F.
GEITHNER, Secretary of the
Treasury; ERIC H. HOLDER JR.,
Attorney General; UNITED STATES
DEPARTMENT OF JUSTICE; HILLARY
RODHAM CLINTON, Secretary of
State; UNITED STATES
DEPARTMENT OF STATE,*
        *Defendants-Appellees.*

07-55893

D.C. No.
CV-05-08047-ABC

OPINION

---

*Timothy F. Geithner is substituted for John W. Snow as Secretary of the Treasury, Eric H. Holder is substituted for Alberto R. Gonzales as Attorney General of the United States, and Hillary Rodham Clinton is substituted for Condoleeza Rice as Secretary of State. Fed. R. App. P. 43(c)(2).

11621

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
November 19, 2008—Pasadena, California

Filed August 24, 2009

Before: Harry Pregerson and Pamela Ann Rymer,
Circuit Judges, and Edward R. Korman,** District Judge.

Opinion by Judge Rymer;
Dissent by Judge Pregerson

---

**The Honorable Edward R. Korman, Senior United States District Judge for the Eastern District of New York, sitting by designation.

**COUNSEL**

David Cole, Georgetown University Law Center, Washington, D.C., for the plaintiffs-appellants.

Joshua Waldman, U.S. Department of Justice, Civil Division, Washington, D.C.; Douglas N. Letter, U.S. Department of Justice, Civil Division, Washington, D.C., (argued), for the defendants-appellees.

---

**OPINION**

RYMER, Circuit Judge:

We are asked to invalidate the President's authority to designate terrorist organizations when there is an extraordinary threat to national security, as well as the Secretary of the Treasury's authorization to designate further organizations; and to declare that a ban on providing "services" to, or for the benefit of, such organizations, is unconstitutionally vague and overbroad.

In the wake of September 11, 2001, President George W. Bush declared a national emergency and, invoking the powers vested in him by the International Economic Powers Act (IEEPA), 50 U.S.C. § 1701, *et seq.*, and the United Nations Participation Act (UNPA), 22 U.S.C. § 287c, signed Executive Order 13224. The Executive Order blocks property of twenty-seven designated terrorists, and authorizes the Secretary of the Treasury to designate others whom the Secretary determines to be acting for, providing support or services to, or are otherwise associated with, designated persons.

The Humanitarian Law Project (HLP)[1] wants to support

---

[1]The Humanitarian Law Project is joined in the action and on appeal by Ralph Fertig, the Ilankai Thamil Sangam, Dr. Nagalingam Jeyalingam, the Tamil Welfare and Human Rights Committee, and the World Tamil Coordinating Committee. We will refer to them collectively as the Humanitarian Law Project, or HLP.

lawful activities of two organizations that are designated as foreign terrorist organizations — the Kurdistan Worker's Party (PKK) in Turkey, and the Liberation Tigers of Tamil Elam (LTTE) in Sri Lanka. It claims to have been deterred from doing so out of fear that HLP, too, will be designated as a terrorist organization pursuant to Executive Order 13224 and its implementing regulations, if HLP provides services of any sort to the PKK and the LTTE. Consequently, HLP brought this action to challenge, on First and Fifth Amendment grounds, the President's authority to designate organizations as terrorists under IEEPA and UNPA; the Secretary of the Treasury's designation authority from the President under Executive Order 13224; the Executive Order's ban on providing services to designated terrorist organizations; and the regulatory licensing scheme under which organizations may apply for permission to engage in activities that are otherwise prohibited.

The district court held in published opinions that HLP lacks standing to contest the President's authority or the licensing scheme; and rejected its contention that the Secretary's designation authority, or the ban on services, is unconstitutionally infirm. *Humanitarian Law Project v. United States Dep't of Treasury*, 463 F.Supp.2d 1049 (C.D. Cal. 2006); *Humanitarian Law Project v. United States Dep't of Treasury*, 484 F.Supp.2d 1099 (C.D. Cal. 2007).

We agree with the district court that the Humanitarian Law Project lacks standing to challenge the President's designation authority because HLP has never been designated, or threatened with designation, on account of it. We disagree with HLP's contention that self-censorship suffices for injury-in-fact because IEEPA on its face does not regulate speech, but conduct. Therefore, the standing requirements for pre-enforcement challenges set out in *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir. 2000), apply. We conclude that HLP likewise cannot show injury-in-fact with respect to the licensing regulations as it has never

applied for, or been denied, a license. We also agree with the district court that the Secretary's authority to designate terrorist groups is adequately constrained by criteria in the Executive Order. Similarly, the ban on "services" to designated organizations is not unconstitutionally vague; "services" are clearly enough delineated by examples in the regulations for a person of ordinary intelligence to understand what kind of activities are not permitted. HLP worries that protected speech such as independent advocacy may be caught in the net, but the Secretary does not interpret the ban this way, nor do we. Finally, we hold that no mens rea is required for IEEPA's civil provisions, and its criminal provisions raise no constitutional concerns as they include willfulness, or knowledge of unlawfulness, as an element. Accordingly, we affirm.

I

This is not the first time that HLP and the government have collided over the government's power to regulate non-terrorist activities in aid of terrorist organizations. HLP previously took on the ban against providing material support and resources to foreign terrorist organizations in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, and its 2004 amendment, the Intelligence Reform and Terrorism Prevention Act (IRTPA), *see* 18 U.S.C. § 2339B. That history is recounted in *Humanitarian Law Project v. Mukasey*, 552 F.3d 916, 920-24 (9th Cir. 2009) (*HLP III*) (amending opinion filed December 10, 2007). Though involving a different statute with different text, *HLP III* and *Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) (*HLP I*), inform some of the issues in this case and both parties draw succor from what we have held.

AEDPA made it a crime for anyone knowingly to provide "material support or resources" to a foreign terrorist organization designated by the Secretary of State. 8 U.S.C. § 1189(a)(1); 18 U.S.C. § 2339B(a). HLP argued that AEDPA

imposed guilt by association, and was unconstitutionally vague and overbroad. We rejected HLP's right of association argument in *HLP I*, holding that the statute prohibited "the act of giving material support, and there is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions." *HLP I*, 205 F.3d at 1133. We pointed out that advocacy is different from donations of material support, expressive conduct is different from pure speech, and "money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts." *Id.* at 1136. We also noted that AEDPA did not regulate speech or association per se, and rejected HLP's argument that the Secretary of State had unfettered discretion to designate a group as a foreign terrorist organization. *Id.* at 1136-37. We held that the Secretary's authority to designate only those groups that engage in terrorist activities sufficiently cabined his discretion. However, we agreed with HLP that two components of "material support" — "training" and "personnel" — were unconstitutionally vague because uncertainty about what was meant could blur the line between protected expression and unprotected conduct. *Id.* at 1137-38.

After *HLP I* (on interlocutory appeal) and before *HLP III* (on appeal from summary judgment), Congress amended the definition of "material support or resources" to include, among other things, an additional prohibition against providing "service" to a designated foreign terrorist organization. *HLP III*, 552 F.3d at 923. Responding to HLP's due process argument, we declined to read a specific intent requirement into the revised statute, as it already required knowledge that the organization to which material support was offered was a designated foreign terrorist organization. *Id.* at 926. However, we held that prohibitions on providing "training," "expert advice or assistance," "service" and "personnel" to designated organizations were unconstitutionally vague because these terms could be read as encompassing speech and advocacy protected by the First Amendment. *Id.* at 928-30. We declined

to hold that AEDPA's ban against providing "material support or resources" was overbroad, as it was not aimed at expressive conduct but rather, as we said in *HLP I*, "at stopping aid to terrorist groups." *Id.* at 931-32 (quoting *HLP I*, 205 F.3d at 1135).

IEEPA, which was enacted in 1977, was not at issue in the earlier litigation. It vests the President with authority to deal with any "unusual and extraordinary threat" to the national security whose source in whole or substantial part is outside of the United States, if the President declares a national emergency. 50 U.S.C. § 1701(a).[2] IEEPA mandates that the President must consult Congress "in every possible instance" before exercising his authority, *id.* § 1703(a), and the President's actions are to be reviewed periodically by Congress, *id.* § 1622(b). When such a national emergency is declared, IEEPA provides that the President may issue regulations to "block" any transaction "with respect to . . . any property in which any foreign country or a national thereof has any interest[.]" *Id.* § 1702(a)(1)(B). However, the President's authority does not extend to regulating or prohibiting donations of food,

---

[2]IEEPA was enacted in 1977 to amend the Trading With the Enemy Act, which, in turn, was enacted in 1917 and amended in 1933. 50 U.S.C. app. § 5(b). IEEPA authorizes the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Under this authority, the President may:

> [I]nvestigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702(a)(1)(B).

clothing, and medicine, intended to be used to relieve human suffering, unless the President determines that such donations would "seriously impair his ability to deal with any national emergency." *Id*. § 1702(b)(2). Section 1704 provides that "[t]he President may issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted . . . ." *Id.* § 1704. The Act provides for a civil penalty ($250,000, or twice the amount of the culpable transaction), *id.* § 1705(b), and a criminal penalty for willful violations (a fine of not more than $1,000,000 or imprisonment for not more than 20 years, or both), *id.* § 1705(c).

On September 23, 2001, President George W. Bush invoked his authority under the Constitution, IEEPA, and UNPA, and found that the "grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001," and the continuing and immediate threat of further attacks on the United States, constitute "an unusual and extraordinary threat to the national security." Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001); *see also* Proclamation No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001) (declaring national emergency). The Executive Order blocked all property and interests that are in the United States of foreign persons listed in an annex attached to it, of persons determined by the Secretary of the Treasury to act for or on behalf of those persons listed, and of persons determined by the Secretary "to assist in, sponsor, or provide financial, material, technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed" or "to be otherwise associated" with those persons. Exec. Order No. 13224 § 1(a), (c), (d)(i)-(ii). In addition, the Executive Order prohibited any transaction in blocked property, including provision of "services to or for the benefit of those persons listed." *Id*. § 2(a). The President found that making any donations of the type specified would seriously impair his ability to deal with the national

emergency declared in the order. *Id.* § 4. Finally, the President authorized the Secretary of the Treasury "to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and UNPA as may be necessary to carry out the purposes of this order." *Id.* § 7. The President listed twenty-seven individuals and groups in the annex, 66 Fed. Reg. at 49083, and later amended it to include the Taliban and its leader, Mohammed Omar. *See* Exec. Order No. 13268, 67 Fed. Reg. 44751 (July 2, 2002).

By regulation, any person or group whose property is blocked by reason of the Executive Order is known as a "specially designated global terrorist," or SDGT. 31 C.F.R. § 594.310. Treasury regulations give examples of "services" that are forbidden, 31 C.F.R. § 594.406(b),[3] and define the term "to be otherwise associated with," 31 C.F.R. § 594.316.[4] Other regulations provide that a person or group that is designated as an SDGT may seek administrative reconsideration, 31 C.F.R. § 594.201(a) n.3, *available at* 72 Fed. Reg. 4206 (Jan. 30, 2007); 31 C.F.R. § 501.807, and allow the Department to grant licenses on a case-by-case basis to permit transactions that would otherwise be prohibited under the Executive Order, 31 C.F.R. §§ 594.501, 501.801-02.

---

[3]The regulation states: "U.S. persons may not, except as authorized by or pursuant to this part, provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, educational, or other services to a person whose property or interests in property are blocked pursuant to § 594.201(a)." 31 C.F.R. § 594.406(b). Section 594.201(a) is the foundational regulation that basically tracks the blocking provisions of the Executive Order.

[4]Section 594.316 provides:

The term "to be otherwise associated with," as used in § 594.201(a)(4)(ii), means:

(a) To own or control; or

(b) To attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services to.

PKK and the LTTE are designated SDGTs.[5] HLP wishes to support the non-violent activities of these groups by providing money, humanitarian aid, engineering and technological support, as well as psychological counseling in areas of Sri Lanka affected by the tsunami, training in human rights alternatives, assistance with peacemaking negotiations, legal help, and assistance in appearing before international lawmaking bodies. HLP asserts that it has been inhibited from doing so by Executive Order 13324 and the regulations implementing it. This action attacks provisions in both.

The parties brought cross-motions for summary judgment. The district court ultimately dismissed HLP's challenge to the President's designation authority and to the regulatory licencing scheme for failure to establish injury-in-fact. The court initially found that the "otherwise associated with" provision in the Executive Order was unconstitutionally vague on its face and overbroad, 463 F.Supp.2d at 1070-71, but reconsidered that ruling and changed it after § 594.316, which cured the defects, was issued in the meantime. 484 F.Supp.2d at 1104-07. The court denied HLP's motion, and granted judgment in the government's favor on HLP's remaining claims.

HLP has timely appealed.

II

HLP maintains that it has standing to challenge the President's designation authority under IEEPA because it credibly fears that if it engages in any activities that might be deemed to benefit or be associated with the PKK or the LTTE, it risks

---

[5]They were so designated by the Secretary of State after he determined that both met the criteria in § 1(b) of Executive Order 13224. 67 Fed. Reg. 12633, 12633-34 (Office of the Coordinator For Counterterrorism, Dep't of State, March 19, 2002). The Secretary of State acted pursuant to an essentially parallel scheme under which the assets of foreign terrorist organizations are blocked and U.S. persons are prohibited from rendering them material support. *See* 8 U.S.C. § 1189; 18 U.S.C. § 2339B.

being designated itself.[6] In HLP's view, First Amendment standing doctrine as articulated in *California Pro-Life Council v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003), controls. Regardless, HLP submits, it may pursue a facial vagueness challenge as IEEPA grants sweeping discretion to the President that allows him to censor, or shut down, disfavored political groups.

[1] Any pre-enforcement analysis starts with our en banc decision in *Thomas.* There, landlords sought to strike down an Alaska housing discrimination law on First Amendment religion and free speech grounds. 220 F.3d at 1138. However, no prospective tenant had ever complained to the landlords, or filed a complaint against them. *Id.* at 1137. The state had never investigated rental practices, or enforced the law criminally; it had only sought to enforce the law civilly twice, and even then, only once was the issue of freedom of religion raised. *Id.* at 1137, 1140-41. Enforcement was neither threatened nor imminent. We considered three factors in evaluating the genuineness of the claimed threat of prosecution: "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.* at 1139 (citing *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996)). Applying these factors, we concluded that the dispute was hypothetical and the landlords' injury was speculative. *See also Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006) (dismissing challenge to travel restrictions issued under IEEPA because the plaintiff had failed to establish "a specific warning or threat to initiate proceedings" under the *Thomas* factors).

---

[6]HLP's suggestion that the district court improperly considered the Secretary's standing arguments on a motion for reconsideration fails, as all courts have a continuing obligation to assess jurisdiction.

**[2]** The *Thomas* factors lead to the same conclusion, here. HLP has never been designated as an SDGT. Nor does it point to any specific warning or threat of being designated. There is no evidence that HLP is similar to the organizations or individuals who have been designated by the President, or that it engages in conduct similar to those organizations. The President designated twenty-seven groups and individuals just after September 11, and added two more in July 2002, but no further designations have been made in the years since. In these circumstances, we cannot say that the threat of designation is "credible," instead of "imaginary or speculative." *Thomas*, 220 F.3d at 1140 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

While *Thomas* leaves the door open to pre-enforcement challenges to laws that allegedly infringe upon constitutional rights, *id*. at 1137 n.1, and we walked through it in *California Pro-Life Council*, this is not a *California Pro-Life Council* case. The Council was a non-profit corporation that took positions on California ballot propositions. 328 F.3d at 1091. The California Political Reform Act imposed burdensome campaign reporting and disclosure obligations for "independent expenditures." *Id.* at 1092. It was aimed directly at the Council's speech, whose proposed communication for the coming election was arguably an "independent expenditure" subject to the Act's reporting and disclosure requirements. *Id.* at 1093. In these circumstances, we concluded that the Council had suffered a constitutionally sufficient injury of self-censorship that gave it standing to pursue a vagueness challenge. *Id.* at 1094-95.

**[3]** Unlike the California Political Reform Act, which was aimed directly at core political speech, IEEPA is not aimed at expression. *See Cal. Pro-Life Council*, 328 F.3d at 1095 (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988)). Nothing on the face of IEEPA implicates First Amendment rights.[7] It simply allows the President, during

---

[7]*See HLP I*, 205 F.3d at 1133-34 (observing that there is no First Amendment right nor any other constitutional right to support terrorists);

peacetime national emergencies, to block transactions "with respect to . . . any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B).[8] Further by contrast to *California Pro-Life Council*, to the extent HLP has any injury as a result of IEEPA, it is indirect. That is, because IEEPA is not directly aimed at HLP's expression, injury-in-fact does not come from IEEPA or from IEEPA's designation authority to the President, but from the *President*'s designation authority to the *Secretary*. There is no suggestion that HLP lacks standing to pursue *this* designation; indeed, the district court and we address its concerns with the Secretary's authority on the merits. But neither self-censorship nor subjective chill is the functional equivalent of a well-founded fear of enforcement when the statute on its face does not regulate expressive activity.

---

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 736-37 (D.C. Cir. 2007) (holding that blocking order does not violate the First Amendment); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (rejecting First Amendment challenge to IEEPA blocking order).

[8]Nor is the UNPA, under which the President also acted, aimed at HLP's speech. That Act simply authorizes the President to implement U.N. Security Council measures by taking certain actions, including prohibiting economic relations between any foreign country or national and persons subject to United States jurisdiction. *See* 22 U.S.C. § 287c. The statute provides:

> [W]henever the United States is called upon by the [United Nations] Security Council to apply measures which said Council has decided . . . the President may, . . . under such orders, rules, and regulations as may be prescribed by him, . . . prohibit, in whole or in part, economic relations . . . between any foreign country or any national thereof or any person therein and the United States or any person subject to the jurisdiction thereof, or involving any property subject to the jurisdiction of the United States.

22 U.S.C. § 287c(a).

HLP says this isn't always so, pointing to *Steffel v. Thompson*, 415 U.S. 452 (1974), and *Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997). We see no support for HLP's position in either case. In *Steffel*, there were specific warnings, threats of enforcement, and prosecution of the plaintiff 's handbilling companion under a local trespass ordinance before suit was brought. 415 U.S. at 459. This was more than mere chilling effect. *Id.* at 476 (Stewart, J., concurring) (noting that the petitioner "succeeded in objectively showing that the threat of imminent arrest, corroborated by the actual arrest of his companion . . . demonstrated a genuine threat of enforcement" of a disputed statute and created an actual concrete controversy with the state) (internal quotations omitted). In *Nunez*, the curfew ordinance on its face was "directed narrowly and specifically at expression or conduct [access to public forums] commonly associated with expression." *Nunez*, 114 F.3d at 950 (internal quotation and citation omitted).[9] This is not true of IEEPA.

Even if the statute must facially cover speech or closely related conduct for its challenge to go forward, HLP submits that IEEPA nevertheless qualifies because it grants unbridled discretion to the President to discriminate against disfavored organizations. For this, HLP relies on *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988). *City of*

---

[9]*American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501 (9th Cir. 1991), which HLP also mentions, is not to the contrary. There, we found plaintiffs who sought to invalidate parts of the McCarran-Walter Act met the standing test even though they were not currently subject to the challenged provisions and had not actually committed the forbidden acts. We thought their claimed threat of future injury was not merely hypothetical or conjectural as they had already been charged with violating the challenged provisions; while the charges were dropped, they were dropped for tactical reasons not because they were thought inapplicable. 970 F.2d at 508. After so holding, we noted that even if the plaintiffs had not already been charged, the statute is regulatory and proscriptive, they fell within the class of persons whose conduct the statute proscribes, and the government had instituted proceedings under it. *Id.*

*Lakewood* involved a challenge to an ordinance conferring significant discretion on city officials to approve design and placement of news racks. *Id.* at 753. Thus, the ordinance expressly covered speech activities, and could be challenged facially; as the Court explained, this made it different from grants of standardless discretion covering other activities, which must be challenged as-applied. *Id.* at 756 n.6. Just as with AEDPA, at issue in *HLP I*, IEEPA "does not regulate speech or association per se." 205 F.3d at 1136-37. Hence, the standardless discretion cases, typified by *City of Lakewood*, do not apply.

Finally, HLP suggested at argument that we should not find a standing problem in this case as the court saw none in *HLP I* or *HLP III*. This is not persuasive, however, for the law at issue in *HLP I* and *III* was AEDPA, which itself banned material support to terrorists, and established the Secretary's ability to designate terrorists pursuant to it. There is no comparable provision in IEEPA.

**[4]** In sum, we agree with the district court's analysis. IEEPA does not on its face implicate First Amendment rights. The harm of self-censorship is not present here. HLP has not been designated, nor threatened with imminent prosecution or designation. For these reasons, we conclude that HLP cannot establish injury-in-fact, and lacks standing to challenge the President's designation authority.

## III

HLP argues that the Executive Order unconstitutionally gives the Secretary discretion to penalize and shut down individuals and groups on the basis of constitutionally protected activities, without any type of scienter, and leaves uncertain what it can do in conjunction with, or on behalf of, the LTTE and PKK.

A

HLP makes the overarching submission that the Secretary's authority to designate groups that have never engaged in terrorist activity is unconstitutionally vague and overbroad. It also argues that the Secretary's designation authority under the Executive Order falls short of the conditions under AEDPA that we approved in *HLP I*. Specifically, HLP posits that under the Executive Order, the Secretary may designate domestic individuals, not just foreign entities as is the case under AEDPA. Further, in its view, the Executive Order authorizes designation of persons and organizations without any finding that they engaged in terrorism, whereas AEDPA requires the Secretary to have reasonable grounds to believe that an organization has engaged in terrorist acts. HLP also faults the breadth of the Secretary's designation authority in that a group can be designated under the Executive Order for activity that is steps removed from any terrorist activity, for example, by attempting to assist someone else who has been designated merely for providing assistance to a terrorist group. Finally, it asserts that the Secretary may designate without a statement of reasons, charges, or an administrative decision justifying the designation.

**[5]** The short answer is that *HLP I* does not purport to set a floor for the constitutionality of designation authority; we merely found sufficient what AEDPA required. Beyond this, the Executive Order does constrain the exercise of discretion. It requires the Secretary to find that the person or organization is "owned or controlled by," or "act[s] for or on behalf of," SDGTs, or else "provide[s] financial, material, or technological support for, or financial or other services to or in support of," acts of terrorism or acts of SDGTs, or is "otherwise associated with" SDGTs. Exec. Order 13224, § 1(c)-(d). These are sufficient checks on the Secretary's discretion to allay constitutional concerns. They are reasonable in light of the fact that the Executive Order is a conduct regulation, not a speech restriction. As we explained in *HLP I*, there is no "right to

provide resources with which terrorists can buy weapons and explosives." 205 F.3d at 1133. The restrictions in the Executive Order are aimed at stopping aid to terrorists. Therefore, the order "serves purposes unrelated to the content of the expression." *Id.* at 1135 (internal citation and quotation omitted). Moreover, the Secretary's designations are subject to reconsideration, after which a written decision must be furnished, 31 C.F.R. § 501.807(d), and are subject to judicial review, *see, e.g.*, *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003). Thus, the Secretary's designation authority is not unconstitutionally vague.

**[6]** Nor is the designation authority unconstitutionally overbroad. To prevail on a facial overbreadth challenge to a law aimed at regulating conduct, HLP must show that the Executive Order "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.' " *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). HLP does not suggest how designation of U.S. groups or individuals under the Executive Order can be unconstitutional if the groups or individuals are aiding or supporting terrorists. By the same token, there is no reason to think that an "infinite regression of designations," as HLP puts it, implicates due process if each designation is in turn based on impermissible dealings with an SDGT.

B

**[7]** HLP mounts facial and as-applied challenges to the ban imposed by the Executive Order on "services."[10] Section

---

[10]At oral argument HLP suggested that it had also challenged the ban on "material support" to SDGTs in § 1(d)(i) of the Executive Order. However, we see no reference to this provision in the complaint or briefs. As the issue is not properly before us, we express no opinion on it.

1(d)(i) of the Executive Order permits the Secretary to designate individuals and entities who "provide . . . financial or other services to or in support of" acts of terrorism and SDGTs. And § 2(a) prohibits transactions by U.S. persons or within the United States, "including but not limited to . . . services to or for the benefit of" an SDGT.

i

"A statute must be sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.' " *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Statutes that are insufficiently clear are void for three reasons: "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Id.*

The parties dispute whether the First Amendment or non-First Amendment test for facial vagueness applies. When a statute "clearly implicates free speech rights," it will survive a facial challenge so long as "it is clear what the statute proscribes 'in the vast majority of its intended applications.' " *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149, 1151 (9th Cir. 2001) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)). Outside the First Amendment context, a plaintiff alleging facial vagueness must show that "the enactment is impermissibly vague in all its applications."

---

We also note that even though HLP did contest the ban on being "otherwise associated with" an SDGT in the district court, it does not seriously press that issue on appeal. (It alludes to it in a footnote.) To the extent pursued, we would in any event affirm for reasons stated by the district court in its order granting reconsideration. 484 F.Supp.2d at 1104-07.

*Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 972 (9th Cir. 2003) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). It is unnecessary to resolve the dispute, however, because HLP still cannot succeed even assuming that the more relaxed standard applies.

HLP maintains that the "services" ban at issue here is even more vague than the AEDPA ban on "service" that was deemed unconstitutional in *HLP III* for two reasons: While AEDPA applies only to services provided "to" a designated entity, Executive Order 13224 and its implementing regulations also prohibit any services done "for the benefit of" a designated entity. In addition, while AEDPA punishes "service" exclusively through the criminal process, the Executive Order and the regulations impose the sanction of closure through a closed administrative process.

[8] The "services" ban in the regulations implementing the Executive Order is different from the "service" ban we invalidated in *HLP III*. The AEDPA ban was unexplicated and contained terms that were themselves vague — "expert advice and assistance," and "training." In those circumstances, it was easy for us "to imagine protected expression that falls within the bounds of the term 'service.' " *HLP III*, 552 F.3d at 930 (internal quotation marks and citation to district court opinion omitted). Here, by contrast, the regulations clarify the term "services" by offering examples of what is contemplated. 31 C.F.R. § 594.406(b) (citing "legal, accounting, financial, brokering, freight forwarding, transportation, public relations, educational, or other services"). The examples take out the guesswork that troubled us in *HLP III*. They make clear that legal and educational services are prohibited. They also indicate that one should not perform a useful professional or business task for a terrorist organization. For these reasons, even if the term "services" standing alone would be ambiguous,[11]

---

[11]*But see United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004) (concluding that the term "services" in a Treasury Department regulation issued under IEEPA and Executive Order 12959 is unambiguous).

the examples alert a person of ordinary intelligence to the services that should not be provided to or for the benefit of SDGTs. In these circumstances, it is clear what the term "services" proscribes in the vast majority of intended applications.[12]

HLP is concerned that the term could ensnare independent advocacy undertaken for the benefit of the PKK and LTTE. It would undoubtedly offend the First Amendment if the regulations were to prohibit independent advocacy. However, they don't. And we see no basis for supposing that they might.

The Secretary has explicitly recognized that the "designation criteria [under the Executive Order] will be applied in a manner consistent with pertinent Federal law, including, where applicable, the First Amendment to the United States Constitution." 72 Fed. Reg. 4206 (January 30, 2007). This reflects the Treasury Department's intent to interpret its own regulations, including the ban on "services," to exclude independent advocacy because independent advocacy is always protected under the First Amendment. *HLP I*, 205 F.3d at 1134. HLP points to no instance in the years since the Executive Order has been in force where the Secretary has designated an organization or individual for engaging in independent advocacy or whose "overwhelming function was political advocacy." *Id.* Similarly, it points to no instance where any person engaged in independent advocacy has been subject to civil or criminal penalties under IEEPA for engaging in such conduct. The government's position is that the term "services" in Executive Order 13224 does not reach independent advocacy. Both because the ban cannot extend to independent advocacy, and because of the government's rep-

---

[12]We note that HLP does not bring a direct First Amendment challenge to the Executive Order — a challenge that would require HLP to address this court's holding in *HLP I* that AEDPA's ban on "material support" was constitutional, 205 F.3d at 1133-36. Thus, in addressing HLP's vagueness challenge, we necessarily limit our focus to assessing whether it is clear what is prohibited by the term "services" in the Executive Order, and find the term as defined by 31 C.F.R. § 594.406 to be sufficiently clear.

resentation that it does not, we decline to void the order on this ground.

HLP also contends that it is unclear whether the ban on "services" covers activities such as teaching human rights advocacy, writing a human rights report, or engaging in public relations advocacy. However, we see no unconstitutional guesswork; as the district court observed, in the vast majority of cases a given individual can distinguish performing a service to an SDGT from independent activity. *HLP v. U.S. Dept. of Treasury*, 463 F.Supp.2d at 1063. Should uncertainty lurk that is not purely hypothetical, however, administrative vehicles are available for clarification.[13]

**[9]** "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. But it is clear what the Executive Order proscribes "in the vast majority of its intended applications." This being so, HLP's facial challenge fails.

ii

**[10]** The ban on "services" is not unconstitutionally vague as-applied to HLP's intended activities, either. The heart of HLP's position is that activities in which it proposes to engage for the benefit of the PKK and LTTE are not linked to the carrying out of terrorist activity. However, this is not so much a quarrel over vagueness, as it is about substance. As the district court explained, the proposed activities clearly constitute prohibited services, and for this reason an as-applied challenge for vagueness does not lie. *HLP v. U.S.*

---

[13]Individuals or institutions in doubt about the propriety of proposed activities may call the Department of Treasury's compliance hotline; e-mail the Treasury's e-hotline mailbox; call Treasury's licensing division, or apply for a license; and consult an attorney in the Chief Counsel's Office, or submit a request for a written interpretation of whether the proposed activity would constitute a violation.

*Dept. of Treasury*, 463 F.Supp.2d at 1058-60; *accord Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 784 (9th Cir. 2006); *Gospel Missions of Am. v. City of Los Angeles*, 419 F.3d 1042, 1048-49 (9th Cir. 2005); *see Parker v. Levy*, 417 U.S. 733, 756 (1974) (holding that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness").

iii

**[11]** Alternatively, HLP posits that the Executive Order's ban on "services" is broader than AEDPA's ban on "service" — which we invalidated in *HLP III* on the footing that it *could be* read to reach protected speech — because the Executive Order bans *all* protected speech. However, the ban in the Executive Order is channeled by 31 C.F.R. § 594.406(b). So understood, the ban on "services" is like the material support ban in AEDPA that we held was *not* overbroad. Neither is "specifically addressed to speech or to conduct necessarily associated with speech," and "[r]arely, if ever, will an overbreadth challenge succeed" in these circumstances. *Hicks*, 539 U.S. at 124; *HLP III*, 552 F.3d at 931 (quoting *Hicks*). The ban imposed by Executive Order 13224, like the material support ban in AEDPA, is not aimed at the expressive component of HLP's conduct but at stopping aid to terrorist groups. It has obvious, legitimate applications. Providing legal, financial, accounting, educational, business, and like services to designated terrorist groups saves them money, which in turn increases the means at their disposal for terrorist acts.[14] Inhib-

---

[14]As the Seventh Circuit recently explained:

If you provide material support to a terrorist organization, you are engaged in terrorist activity even if your support is confined to the nonterrorist activities of the organization. Organizations that the statute, and indeed in this instance common parlance, describes as terrorist organizations, such as Hamas in Gaza and Hezbollah in Lebanon, often operate on two tracks: a violent one and a peaceful one (electioneering, charity, provision of social

iting this provision of services is for this reason a legitimate government regulation of constitutionally unprotected conduct. That some particular instances of protected speech may fall within the Executive Order does not make those instances substantial when compared to its legitimate scope. *HLP III*, 552 F.3d at 932. In sum, as the Executive Order is not aimed at speech and does not cover a substantial amount of it, the ban on "services" to SDGTs is not facially overbroad.

## C

HLP faults IEEPA for imposing the penalties of designation, civil fines, and criminal sanctions without sufficient mens rea.[15] It claims that designation and civil penalties,

---

services). If you give money (or raise money to be given) for the teaching of arithmetic to children in an elementary school run by Hamas, you are providing material support to a terrorist organization even though you are not providing direct support to any terrorist acts.

*Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008).

[15] IEEPA's penalties section, 50 U.S.C. § 1705, provides:

(a) Unlawful acts. It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.

(b) Civil penalty. A civil penalty may be imposed on any person who commits an unlawful act described in subsection (a) of this section in an amount not to exceed the greater of—

(1) $250,000; or

(2) an amount that is twice the amount of the transaction that is the basis of the violation with respect to which the penalty is imposed.

(c) Criminal penalty. A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

which in HLP's view are "quasi-criminal," run afoul of the First and Fifth Amendments because they do not require knowledge that the recipient of forbidden support is designated. And it maintains that both civil and criminal penalties must require specific intent.

i

We determine whether civil penalties are so severe that they should carry the same due process guarantees as criminal offenses by following the guideposts set out in *Hudson v. United States*, 522 U.S. 93 (1997). *See, e.g.*, *Reiserer v. United States*, 479 F.3d 1160 (9th Cir. 2007) (applying the *Hudson* test to determine whether IRS penalties were criminal penalties that abated with death of the party).[16] Thus, we "first ask whether the legislature, in 'establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.' " *Id.* at 1163 (quoting *Hudson*, 522 U.S. at 99). " 'Even in those cases where the legislature has indicated an intention to establish a civil penalty,' " we " 'inquire[ ] further whether the statutory scheme was so punitive either in purpose or effect, as to transform what was clearly intended as a civil remedy into a criminal penalty.' " *Id.* (quoting *Hudson*, 522 U.S. at 99). In making that determination, we consider

> (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes

---

[16]This court has used the *Hudson* test to determine whether a penalty is criminal or civil in a variety of circumstances. *See Noriega-Perez v. United States*, 179 F.3d 1166, 1171-74 & n.3 (9th Cir. 1999) (applying *Hudson* test to determine whether immigration statute was civil or criminal as relevant to appellant's claim that statute violated separation of powers); *see also*, *Louis v. C.I.R.*, 170 F.3d 1232, 1234-36 (9th Cir. 1999) (per curiam) (applying *Hudson* test and holding that defendant's challenges to tax assessments alleging Fifth and Sixth Amendment violations failed because the assessments "[were] civil, not criminal, in nature").

> into play only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment — retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may be rationally connected may be assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*Id.* (quoting *Hudson*, 522 U.S. at 99-100).

**[12]** Congress clearly intended the civil penalties under IEEPA to be civil, not criminal. It said so in so many words, describing a "civil penalty" in § 1705(b), and distinguishing a "civil penalty" from a "criminal penalty" that is separately provided for in § 1705(c). *See Hudson*, 522 U.S. at 103 (concluding that "it [was] evident that Congress intended the [challenged penalties] to be civil in nature" where statutes "expressly provide[d] that such penalties are 'civil.' "). The nature of the penalty — $250,000 or double the amount of the transaction — is also civil, rather than criminal, in nature. Correspondingly, it is evident that the President meant for designation to be civil as he conferred authority to make further designations on the Treasury Department. *Id.* (stating that Congressional delegation of authority upon an administrative agency made the sanction a civil penalty).

**[13]** The *Hudson* factors do not indicate that the civil penalties are really criminal. IEEPA's civil penalties are monetary, with no other "affirmative disability or restraint." *Reiserer*, 479 F.3d at 1163 (quoting *Hudson*, 522 U.S. at 104). Such monetary penalties have not "historically been regarded as punishment." *Id.* (citation omitted). Designation carries more than monetary bite for U.S. entities, but exceptions are available on a case-by-case basis. Neither the civil penalty provision nor designation has a mens rea requirement, weighing against finding that these are criminal penalties. While civil fines and designation have a deterrent effect, " 'the mere pres-

ence of this purpose is insufficient to render a sanction criminal.' " *Id.* at 1164 (quoting *Hudson*, 522 U.S. at 102). Finally, the same conduct may be punished both civilly and criminally, but this alone does not render all the penalties criminally punitive. *Hudson*, 522 U.S. at 105.

On balance, we conclude that HLP has not shown by "clearest proof" that either the civil penalty or designation is so punitive as to be criminal. *Id.* at 100. Although designation presents a closer call than the civil penalty, at the end of the day we are influenced by the fact that designation, at the core, is a function of national security and foreign policy[17] and thus serves an alternative function other than punishment. As such, we accord deference to the executive branch's decision that designation is necessary for the national interest. As a penalty, designation is not excessive in relation to that purpose.

**[14]** Therefore, neither the civil penalty nor designation offends the First and Fifth Amendments for lack of sufficient *mens rea*.

ii

**[15]** For the same reasons, IEEPA's civil penalties do not violate the First and Fifth Amendments because they do not require proof of specific intent to further a designated entity's terrorist activities. HLP's principal argument, that both the civil and criminal penalties violate the First and Fifth Amendments' prohibition on guilt by association, is basically foreclosed by prior *HLP* rulings. In *HLP I* we rejected a similar challenge to AEDPA because that statute punishes "material

---

[17]*See, e.g.*, *Islamic Am. Relief Agency*, 477 F.3d at 734 (reviewing designation under Executive Order 13224 deferentially); *Holy Land*, 333 F.3d at 166 (noting that review of SDGT designation "involv[es] sensitive issues of national security and foreign policy"); *see also, HLP I*, 205 F.3d at 1137 (AEDPA designations "involve[ ] the conduct of foreign affairs" so "we owe the executive branch even more latitude than in the domestic context").

support," not association. *HLP I*, 205 F.3d at 1134. It follows that to the extent IEEPA punishes "services," it does not punish association. In *HLP III*, we also rejected HLP's effort to introduce a specific intent requirement into AEDPA's criminal provision, 18 U.S.C. § 2339B, which punished those who "knowingly provide[ ] 'material support or resources' to a designated foreign terrorist organization . . . ." *HLP III*, 552 F.3d at 926. As we explained, this provision exposed someone to criminal liability only where the government proved culpable intent, in the case of AEDPA — knowledge. *Id.* (distinguishing *Scales v. United States*, 367 U.S. 203 (1961), upon which HLP relies here as well, as involving a statute "which was silent with respect to requisite mens rea"). IEEPA's requirement that a person act "willfully" likewise "satisfies the requirement of 'personal guilt' and eliminates any due process concerns." *Id.*

**[16]** Thus, IEEPA's penalties do not violate the First and Fifth Amendments.

IV

**[17]** HLP argues that the licensing scheme in 31 C.F.R. §§ 501.801-02 violates the First and Fifth Amendments by giving the Director of the Office of Foreign Assets Control (OFAC) unregulated discretion to grant or deny exemptions from IEEPA prohibitions. HLP lacks standing to pursue this issue, however, for reasons stated by the district court. *HLP v. U.S. Dept. of Treasury*, 463 F.Supp.2d at 1071-72; *see San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In short, HLP has not been denied a license under the licensing provision or even applied for one; the licensing provision is not the cause of HLP's asserted injury; and invalidation of the licensing provision would not redress any injury that HLP has suffered.

HLP relies for the first time in reply on *City of Lakewood*, 486 U.S. at 755-56. Even if not waived, its reliance is unavail-

ing. As we have explained, the conditions that gave rise to standing in *City of Lakewood* for a pre-enforcement challenge do not exist here. The Executive Order and the licensing regulations implementing it are aimed (in relevant part) at the provision of services, which is conduct-based, not at affording or denying a chance to speak that is content- or viewpoint-based.

V

As a final point, HLP urges us to apply a saving construction to IEEPA to avoid constitutional difficulties. We see no need to do so. Nor do we accept the proposition that IEEPA should be narrowed to require a nexus between a sanction against a national and a sanction against his country. HLP points out that the statute permits the President to block transactions with "any foreign country or a national thereof,"[18] from which it infers that the word "thereof" indicates the need for a link with sanctions against the country. However, neither the text nor the Constitution requires this construction. The statute permits the President to act with respect to any foreign country, *or* any national, without first requiring that sanctions be imposed against the country.

HLP's proffered construction of IEEPA is not necessary to keep AEDPA, 18 U.S.C. § 2339B, from being superfluous. The statutes have different characteristics and consequences. Among other things, IEEPA is triggered only when the President declares a national emergency and takes action, whereas AEDPA is applicable when the Secretary of State designates

---

[18]50 U.S.C. § 1702(a)(1)(A)(ii) provides that the President may "investigate, regulate, or prohibit . . . transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof."

Subsection 1702(a)(1)(B) allows the President to act in the respects identified with respect to property "in which any foreign country or a national thereof has any interest by any person." *See supra* note 2.

a group as a foreign terrorist organization. The material support statute renders inadmissible any alien who has engaged in terrorist activities, *see* 8 U.S.C. § 1182(a)(3)(B)(i)(IV) and (V), whereas IEEPA does not. And AEDPA's criminal *mens rea* requirement differs from IEEPA's.

**[18]** We therefore decline to adopt HLP's suggestions for a saving construction.

## VI

We conclude that the district court correctly dismissed HLP's challenge to the President's designation authority under IEEPA and the UNPA. IEEPA has never been enforced against HLP, nor has enforcement or designation ever been threatened. Self-censorship, which suffices for pre-enforcement challenges to statutes that are aimed at speech on their face, is insufficient here because IEEPA is aimed at the conduct of engaging in transactions with designated entities, not at HLP's speech.

HLP's challenge to the Secretary's designation authority fails on the merits. The ban on "services" in the Executive Order is neither unconstitutionally vague nor overbroad, on its face or as applied. It is adequately explicated in the regulations such that a person of ordinary intelligence can figure out the sort of assistance that is not allowed. HLP's intended activities are plainly within it. Independent advocacy is not. And IEEPA's civil penalties may be imposed without *mens rea* requirements because they are indeed civil; its criminal penalties require a culpable state of mind and the Constitution does not additionally require specific intent to further terrorist activities.

HLP lacks standing to challenge the Treasury Department's licensing scheme. Under it, anyone can apply for an exemption from the ban on services. Having not done so, HLP is in

no position to assert injury from what it believes to be the Secretary's standardless discretion to grant or deny licenses.

Given no constitutional difficulties of the magnitude that requires a narrowing construction, we decline to rewrite IEEPA more narrowly.

AFFIRMED.

---

PREGERSON, Circuit Judge, dissenting in part:

I dissent from Parts II and III.B. of the majority opinion. HLP's standing to challenge the President's power to designate entities as specially designated global terrorists should be analyzed using the less rigid standard appropriate when First Amendment rights are at stake. Furthermore, I disagree with the majority's conclusion that the Executive Order's ban on "services" is valid, because I do not agree that a person of ordinary intelligence would be put on notice of whether his or her desired conduct would be considered a prohibited "service."

I

The majority concludes that HLP lacks standing to challenge the President's unfettered power to designate entities as specially designated global terrorists (SDGTs) because HLP has failed to demonstrate an injury-in-fact. In so concluding, the majority finds that using a First Amendment standing analysis for a pre-enforcement challenge is not proper in this case. I disagree.

"Particularly in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003). The majority holds that

because IEEPA[1] does not, on its face, implicate First Amendment rights, HLP cannot avail itself of the less rigid standing requirements. Our case law, however, does not support the majority's chosen mode of analysis.

First, no case holds that the standing analysis used in the First Amendment context requires that the challenged statute must on its face implicate First Amendment rights. To the contrary, to invoke that standing analysis, the plaintiff must only show "an actual and well-founded fear that the law will be enforced against [him or her]." *California Pro-Life Council*, 328 F.3d at 1095 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (alteration in original)). "[S]uch a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *California Pro-Life Council*, 328 F.3d at 1095. A fear of prosecution does not mean that the plaintiff must have been personally threatened with prosecution:

> A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute . . . . [I]f [the statute] *arguably covers* [his conduct], and so may deter constitutionally protected expression . . . there is standing."

*Id.* at 1095 (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)) (emphasis added).

---

[1]IEEPA authorizes the President to declare a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part oustide the United States, to the national security, foreign policy, or economy of the United States [.]" 50 U.S.C. § 1701(a). Upon declaring such an emergency, the President may then exercise the authority granted by section 1702. 50 U.S.C. § 1701(b). Section 1702 authorizes the President to block any transaction "with respect to . . . any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States [.]"

Here, HLP argues that it has a well-founded fear of prosecution because it seeks to engage in activities (for example, providing training in human rights advocacy) that might be deemed "association with" the PKK or the LTTE, or activities which might be deemed to benefit those organizations. Based on those activities, which involve conduct protected by the First Amendment, HLP fears it might fall within the President's broad power to designate entities as specially designated global terrorists. Because HLP's First Amendment rights are implicated, I believe our "less rigid" standing analysis is the appropriate framework for this case.

The majority finds that this case is distinguishable from *California Pro-Life Council* and that the less rigid standing analysis should not apply. The holding of *California Pro-Life Council*, however, encompasses the facts of this case. HLP is not "nakedly asserting that [its] . . . speech was chilled by the statute." *California Pro-Life Council*, 328 F.3d at 1095. HLP seeks to support and advocate on behalf of the lawful activities of two organizations designated as foreign terrorist organizations. HLP has been deterred from taking its desired course of action out of fear that it will be subject to the President's designation authority, and all its assets frozen. While this case may be factually distinguishable from *California Pro-Life Council*, the same risks of self-censorship are present. I therefore dissent from the majority's standing analysis.

II

I disagree with the majority's holding that the Executive Order's ban on providing "services" here is valid. According to the majority, the ban is distinguishable from the ban invalidated in *HLP III* because here, relevant regulations clarify what the term "services" means. It is true that 31 C.F.R. § 594.406(b) provides examples of banned services: "legal, accounting, financial, brokering, freight forwarding, transportation, public relations [and] educational" services are all clearly prohibited. The list then unhelpfully concludes, how-

ever, with the phrase "or other services," thereby vitiating whatever aid the list could have provided in discerning what conduct is banned. Relying on this list, a person of ordinary intelligence would not be put on notice of whether his or her desired conduct would be considered a prohibited "service."

HLP argues that the term "services" could easily trench upon independent advocacy undertaken for the benefit of a designated group. The majority finds this is not the case, because the government reassures us that it will not apply the regulation to protected speech. The Treasury Department, for example, promises to apply its regulations in a manner "consistent with pertinent Federal law, including, where applicable, the First Amendment . . . ." 72 Fed. Reg. 4206 (Jan. 30, 2007). The government has taken the position and made representations that the term "services" does not reach independent advocacy. I doubt whether such expressed intentions and representations—no matter how earnestly made—could assuage the reasonable fears of entities who stand to have all their assets frozen if the Secretary should change course. Accordingly, I dissent.